944 F.2d 1253
 UNITED STATES of America, Plaintiff-Appellee,
v.
Billy Joe CHAMBERS (89-1381), Larry M. Chambers
(89-1380/1950), Willie L. Chambers (89-1877/1879), Otis B.
Chambers (89-1357/1949), Belinda Lumpkin (89-1382), Jerry L.
Gant (89-1358), Marshall Glenn (89-1396), Eric L. Wilkins
(89-1359), and Elayne C. Lucas (89-1360), Defendants-Appellants.
 Nos. 89-1357 to 89-1360, 89-1380 to 89-1382, 89-1396,
89-1877, 89-1879, 89-1949 and 89-1950.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 13, 1990.
Decided Sept. 10, 1991.
 
 Larry Bunting, Asst. U.S. Atty., John R. Roth, Asst. U.S. Atty. (argued and briefed), Detroit, Mich., for plaintiff-appellee.
 Thomas V. Wilhelm (argued and briefed), Frederick K. Hoops & Assoc., Birmingham, Mich., for Otis Bernard Chambers.
 Curtis R. Williams (argued and briefed), Detroit, Mich., for Jerry Lee Gant.
 Timothy P. Murphy (briefed), Detroit, Mich., for Eric Lamar Wilkins.
 Ronald R. Gold (argued and briefed), Southfield, Mich., for Elayne Coleman Lucas.
 Elayne Coleman Lucas, Detroit, Mich., pro se.
 Rita C. Martin (argued and briefed), Federal Public Defenders Office, Anthony T. Chambers (argued), Detroit, Mich., Larry Marlowe Chambers.
 Douglas R. Mullkoff (argued and briefed), Kessler & Geer, Ann Arbor, Mich., for Billy Joe Chambers.
 Rudolph A. Wartella, III (argued and briefed), East Detroit, Mich., for Belinda Lumpkin.
 David I. Goldstein (briefed), Ann Arbor, Mich., for Marshall Glenn.
 John R. Minock (argued and briefed), Kelley & Cramer, Ann Arbor, Mich., for Willie Lee Chambers.
 Willie Lee Chambers, pro se.
 Before RYAN and NORRIS, Circuit Judges, and WILHOIT, District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 Defendants are nine members of a drug trafficking conspiracy known as the Chambers Brothers Organization. They appeal their convictions for conspiracy and related crimes.
 
 I.
 
 2
 On February 29, 1988, twenty-two persons were named in a fifteen-count indictment charging conspiracy with the intent to possess and distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 846; possession with the intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); possession of a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c); tax evasion, in violation of 26 U.S.C. § 7201; and continuing criminal enterprise, in violation of 21 U.S.C. § 848.
 
 
 3
 The drug conspiracy involved an extensive crack cocaine distribution network in the City of Detroit, organized and directed by brothers Billy Joe and Larry Chambers, and known as the Chambers Brothers Organization. The conspiracy allegedly began in 1983 and continued through February 1988. There was testimony that the widespread and carefully structured operations generated narcotics sales of as much as $200,000 a day. The operation was conducted out of various locations in the City of Detroit and was policed by a cadre of conspirator/enforcers known as "the wrecking crew." All twenty-two persons indicted were members of the organization.
 
 
 4
 At the time of trial, four of the indictees were fugitives, and four others had pled guilty. The remaining fourteen indictees are the defendants in this case and were tried jointly. They were tried by a jury except Willie Lee Chambers, who was tried by a judge. During the trial, the government dismissed charges against four of the original defendants and the jury acquitted one. The remaining nine defendants were convicted, and now appeal.
 
 
 5
 The nine defendants raise a host of issues, of which the following are most significant:
 
 
 6
 1. Application of the Federal Juvenile Delinquency Act of 1938, 18 U.S.C. § 5031, et seq.
 
 
 7
 2. Denial of a change of venue due to pretrial publicity.
 
 
 8
 3. Denial of a mistrial following recantation of testimony.
 
 
 9
 4. Sufficiency of the evidence of conspiracy.
 
 
 10
 5. Double jeopardy.
 
 
 11
 6. Sentence guidelines issues.
 
 We conclude that:
 
 12
 The convictions of Lumpkin and Wilkins must be vacated and their cases remanded for a hearing and ultimate disposition consistent with what we have said in part II-A;The convictions of Billy Joe and Larry Chambers for conspiracy and continuing criminal enterprise violate the Double Jeopardy Clause of the Fifth Amendment and one of the two convictions and its corresponding sentence must be vacated in each case; and that
 
 
 13
 All other convictions must be affirmed.
 
 II.
 A.
 The Federal Juvenile Delinquency Act
 
 14
 The jury found Belinda Lumpkin and Eric Wilkins guilty of conspiracy to distribute, and conspiracy to possess with intent to distribute, "crack" cocaine and marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 846. Lumpkin and Wilkins were under eighteen years of age during the greater part of the conspiracy and performed their overt acts in furtherance of the conspiracy while they were between fifteen and eighteen years of age. Thus they were eligible for special procedural protections afforded certain juveniles under the Federal Juvenile Delinquency Act ("FJDA" or "the Act") of 1938, as amended, 18 U.S.C. § 5031 et seq. Nevertheless, the government proceeded against Lumpkin and Wilkins as adults, and they failed to invoke the Act's protection until the close of the government's case-in-chief. They then filed motions for mistrial or acquittal on the ground that the district court lacked subject-matter jurisdiction due to the government's failure to file a certification required by the Act. The government responded by tendering the statutorily required certification, along with a motion to proceed against the juvenile defendants as adults.
 
 
 15
 The district court denied Lumpkin's and Wilkins' motions, and they appeal. The district court concluded that the certification requirement pertained to personal, rather than subject-matter, jurisdiction and that Lumpkin and Wilkins waived the issue of personal jurisdiction by failing to timely object. Alternatively, the district court concluded that the government's tender of certification at the close of its case-in-chief was timely. We agree with the district court's latter conclusion but nevertheless find it necessary to remand Lumpkin's and Wilkins' cases to the district court for further proceedings.
 
 1.
 
 16
 Congress enacted the FJDA in order to remove juveniles from the ordinary federal criminal justice system and to provide them with protections not available to adults accused of committing crimes. See United States v. Frasquillo-Zomosa, 626 F.2d 99, 101 (9th Cir.), cert. denied, 449 U.S. 987, 101 S.Ct. 405, 66 L.Ed.2d 249 (1980). The Act defines "juvenile" and "juvenile delinquency" as follows:
 
 
 17
 [A] "juvenile" is a person who has not attained his eighteenth birthday, ... and "juvenile delinquency" is the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult.
 
 
 18
 18 U.S.C. § 5031. Persons who have not attained age twenty one but who have committed acts of juvenile delinquency are also "juveniles." Id. The statute further provides:
 
 
 19
 A juvenile alleged to have committed an act of juvenile delinquency, ... shall not be proceeded against in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that ... (3) the offense charged is ... an offense described in section 841 ... of title 21, and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction.
 
 
 20
 If the Attorney General does not so certify, such juvenile shall be surrendered to the appropriate legal authorities of such State.
 
 
 21
 18 U.S.C. § 5032 (emphasis added). A successful prosecution under the Act does not result in a criminal conviction but rather in an adjudication that the defendant has entered into a state of juvenile delinquency.2.
 
 
 22
 The federal courts are courts of limited jurisdiction, see, e.g., Insurance Corp. of Ireland v. Compagnie des Bauxites, 456 U.S. 694, 701, 102 S.Ct. 2099, 2103, 72 L.Ed.2d 492 (1982), and, for purposes of jurisdiction, there exists no general federal common law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Consequently, the district court possessed subject-matter jurisdiction with respect to Lumpkin's and Wilkins' cases only if there exists some specific constitutional or statutory provision expressly or impliedly conferring such jurisdiction.
 
 
 23
 In cases where the federal government accuses adults of committing federal crimes such as possession with intent to distribute controlled substances, federal statutes confer jurisdiction upon the district courts. See, e.g., 18 U.S.C. § 3231; 21 U.S.C. § 841. As the district court noted, prior to the enactment of the FJDA, the government successfully relied upon such statutes as the jurisdictional basis for prosecuting juveniles in the district courts. Cf. United States v. Allen, 574 F.2d 435, 437 (8th Cir.1978).
 
 
 24
 The enactment of the FJDA, however, reflects a legislative perception that accused juvenile offenders generally belong in the hands of state authorities, absent unusual circumstances and/or special procedural protections. The Seventh and Ninth Circuits have discussed the legislative policy underlying the FJDA as follows:
 
 
 25
 The certification procedure in the Federal Juvenile Delinquency Act encompasses a recognition of the general policy of federal abstention. The official summary and analysis of the 1974 amendments to the Act stated:
 
 
 26
 The federal courts and federal correctional system have never been properly equipped to handle large numbers of juveniles with the result that federal juvenile delinquents are frequently transferred away from their home communities for treatment. By deferring jurisdiction to state courts, the harmful effects of this dislocation would be reduced.
 
 
 27
 120 Cong.Rec. 25162 (1974). The certification procedure was designed to ensure that only where jurisdiction existed nowhere but in the federal courts or where the particular state did not have available programs and services adequate for the needs of juveniles were the federal courts to intrude in a juvenile case.
 
 
 28
 United States v. Sechrist, 640 F.2d 81, 84 (7th Cir.1981).
 
 
 29
 Their [the certification requirements'] purpose was to help ensure that state and local authorities would deal with juvenile offenders wherever possible, keeping juveniles away from the less appropriate federal channels.
 
 
 30
 ....
 
 
 31
 Congress' desire to channel juveniles into state and local treatment programs ... [is] clearly expressed in the legislative history of section 5032....
 
 
 32
 United States v. Juvenile Male, 864 F.2d 641, 644 (9th Cir.1988). In short, Congress "recognized that the federal court system is at best ill equipped to meet the needs of juvenile offenders. Deference to the state courts should always be observed except in the most severe of cases." United States v. Juvenile, 599 F.Supp. 1126, 1130 (D.Ore.1984).
 
 
 33
 Our review of this legislative policy and of the structure of the FJDA, especially sections 5031 and 5032, leads us to conclude that the FJDA impliedly revoked the district courts' preexisting, largely unrestricted subject-matter jurisdiction over criminal prosecutions against juveniles. The FJDA accomplished this result, we believe, by effectively establishing that the acts which federal statutes declare to be criminal are generally noncriminal when committed by juveniles. As noted, juveniles committing these acts merely enter into a state of "juvenile delinquency," defined as a "violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult." 18 U.S.C. § 5031 (emphasis added). If juveniles generally commit no "crimes" when performing these acts, the district court and government cannot rely upon the criminal statutes as a basis for the court's assumption of jurisdiction over the prosecution of juveniles. Rather the district court generally must surrender the accused juveniles to the appropriate state authorities. See 18 U.S.C. § 5032.
 
 
 34
 Of course, the jurisdiction which Congress took away from the federal courts with one hand Congress partially restored with the other hand. Congress conferred jurisdiction upon the district courts to proceed, under the authority of section 5032, against juveniles committing acts that would be federal crimes if committed by adults, where the prosecution meets the statutorily prescribed certification requirements set forth above.[1] Accordingly, the certification requirement is a prerequisite to the district court's subject-matter jurisdiction in cases where the government proceeds against juveniles accused of performing acts which would be federal crimes if committed by adults. In other words, Congress effectively eliminated the underage defendant's "crime," and replaced it with "juvenile delinquency," a state vesting jurisdiction in the federal courts under the terms of section 5032 or not at all.
 
 
 35
 Our conclusions may come into apparent conflict with some language found in the Eighth Circuit's opinion in Allen, 574 F.2d at 435. Addressing a different type of jurisdictional problem related to the FJDA, the Allen court noted:
 
 
 36
 [The juvenile] was found by the trial court to have committed assault with a deadly weapon, an act cognizable under [18 U.S.C.] § 1153. The fact that he elected to be treated procedurally as a juvenile did not alter the underlying federal jurisdiction by making his acts any less violative of that statute. The existence of primary federal jurisdiction under § 1153 is evident when it is considered that [the juvenile] could have waived treatment as a juvenile and requested criminal prosecution as an adult.
 
 
 37
 Id. at 437-38. This sweeping, overly broad language overlooks the fact that the minor would not have been in a position to waive, or not to waive, anything had the district court not first properly obtained jurisdiction over the case following the prosecution's tendering of an effective certification. See id. at 438. Moreover, whatever implications the government seeks to draw from the Allen decision, the Eighth Circuit itself probably has disavowed such implications in a more recent decision. See United States v. Juvenile Male, 923 F.2d 614 (8th Cir.1991).
 
 3.
 
 38
 Here, as its first ground for denying defendants' motion, the district court concluded that the jurisdictional defect under section 5032 pertained to personal, rather than subject-matter, jurisdiction and hence was waivable by the juveniles. The Supreme Court has described the distinction between subject-matter and personal jurisdiction as follows:
 
 
 39
 Subject-matter jurisdiction ... is an Article III as well as a statutory requirement; it functions as a restriction on federal power, and contributes to the characterization of the federal sovereign.
 
 
 40
 ....
 
 
 41
 The requirement that a court have personal jurisdiction flows not from Art III, but from the Due Process Clause. The personal jurisdiction requirement recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty. Thus, the test for personal jurisdiction requires that "the maintenance of the suit ... not offend 'traditional notions of fair play and substantial justice.' "
 
 
 42
 Compagnie des Bauxites, 456 U.S. at 702-03, 102 S.Ct. at 2103-04 (footnote omitted) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). While lack of personal jurisdiction is a waivable defect, lack of subject-matter jurisdiction is a nonwaivable defect which may be raised by any party at any time. See id. at 703-04, 102 S.Ct. at 2104-05; Fed.R.Crim.P. 12(b)(2).
 
 
 43
 In enacting section 5032's certification requirement, Congress concerned itself primarily with the proper allocation, between state and federal government, of the power to decide cases involving juveniles accused of acts generally made criminal by federal statutes. By contrast, Congress concerned itself very little or not at all with juveniles' individual liberty interests and with notions of fair play. Thus section 5032's certification requirement bears upon the issue of subject-matter, not personal, jurisdiction.[2]
 
 
 44
 Accordingly, we conclude that the district court lacked jurisdiction over Lumpkin's and Wilkins' cases, absent a timely tender of the statutorily mandated certification.
 
 4.
 
 45
 We turn now to the task of determining whether the government's tender of the certification was timely.
 
 
 46
 At the outset, we note that establishing the factors necessary for federal jurisdiction is not always a prerequisite to initiating federal proceedings. A federal court may assume jurisdiction, for example, for the purpose of determining its jurisdiction. As the Fifth Circuit has noted, "While [section 5032] obviously intends that deference be given state court juvenile processes where they are available, its phraseology requires no abdication of federal jurisdiction to begin an action." United States v. Cuomo, 525 F.2d 1285, 1290 (5th Cir.1976).
 
 
 47
 Without deciding whether a certification appended to the government's appellate brief was too late, the Ninth Circuit has noted, "[Section 5032] does not set forth when the certification need be filed.... [The statute also] does not state that proceedings cannot be undertaken until a certificate is filed." United States v. Gonzalez-Cervantes, 668 F.2d 1073, 1077 n. 6 (9th Cir.1981) (emphasis in original). Similarly, a federal district court has recognized that section 5032 does not require a certification before a underage defendant has been "proceeded against." United States v. Ramapuram, 432 F.Supp. 140, 143 (D.Md.1977), aff'd, 577 F.2d 738 (4th Cir.) (unpublished), cert. denied, 439 U.S. 926, 99 S.Ct. 309, 58 L.Ed.2d 318 (1978). The district court reasoned:
 
 
 48
 Both the statutory language and S.Rep. 93-1011 state that a juvenile shall not be proceeded against in federal court "unless" there is filed a proper certification. Neither source declares that there may be no proceedings "until" a proper certification is filed. Nor is the language to the effect that there may be no proceedings "unless" a certification is "first" filed. In short, there is no language of priority.
 
 
 49
 Id.
 
 
 50
 We conclude that under the circumstances of this case, the government's certification was timely when tendered at the close of its case-in-chief. Lumpkin and Wilkins may protest that the delayed certification imposed an unnecessary hardship upon the defense. However, without endorsing the government's regrettable tardiness in tendering the delayed certification, a jurisdictional prerequisite, we might point out that the defense was as much at fault as the government in failing to raise the issue of the defendants' juvenile status at an earlier stage of the proceedings. Had Lumpkin and Wilkins challenged the court's jurisdiction at an earlier point, the government would have had no choice but to tender the certification immediately. Moreover, Lumpkin and Wilkins have failed to show us how they were prejudiced by not receiving the certification at an earlier date.5.
 
 
 51
 Under section 5032, proper certification confers jurisdiction upon the district court to proceed against a juvenile offender; however, certification alone does not determine whether the government must proceed against the juvenile as a juvenile, with the special procedural protections afforded by the Act, or whether the government may proceed against the juvenile as an adult, in a criminal prosecution. With respect to this issue, section 5032 provides in pertinent part as follows:
 
 
 52
 [N]o criminal prosecution shall be instituted for the alleged act of juvenile delinquency except as provided below.
 
 
 53
 [W]ith respect to a juvenile fifteen years and older alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is ... an offense described in section 841 ... of title 21, criminal prosecution ... may be begun by motion to transfer of the Attorney General in the appropriate district court of the United States, if such court finds, after hearing, such transfer [for prosecution as an adult] would be in the interest of justice....
 
 
 54
 Evidence of the following factors shall be considered, and findings with regard to each factor shall be made in the record, in assessing whether a transfer would be in the interest of justice: the age and social background of the juvenile; the nature of the alleged offense; the extent and nature of the juvenile's prior delinquency record; the juvenile's present intellectual development and psychological maturity; the nature of past treatment efforts and the juvenile's response to such efforts; the availability of programs designed to treat the juvenile's behavioral problems.
 
 
 55
 18 U.S.C. § 5032.
 
 
 56
 While the government filed a motion to proceed against Lumpkin and Wilkins as adults, the district court held no hearing to evaluate the propriety, in light of the above-listed factors, of so proceeding. If the district court had held such a hearing and found it in the interest of justice to try Lumpkin and Wilkins as adults, the court properly could have allowed the ongoing criminal prosecution to continue. On the other hand, if the district court, after the required hearing, had found it not to be in the interest of justice to try them as adults, the district court would have been obliged to dismiss the criminal prosecution and treat the action as a delinquency proceeding.[3]
 
 
 57
 Under these circumstances, the appropriate remedy is to vacate Lumpkin's and Wilkins' convictions and remand their cases for the statutorily required hearing concerning the propriety of prosecuting them as adults. Cf. United States v. C.G., 736 F.2d 1474, 1479 (11th Cir.1984). On remand, the district court shall hold a hearing and make the required fact findings based upon the circumstances existing at the time of Lumpkin's and Wilkins' trial, giving no regard to subsequent events occurring as a result of the criminal prosecutions and convictions. Cf. Powell v. Hocker, 453 F.2d 652, 656-57 (9th Cir.1971). Only if the court determines that the interest of justice dictates prosecuting Lumpkin and Wilkins as adults shall the court reinstate their convictions.
 
 B.
 Change of Venue Due to Pretrial Publicity
 
 58
 Larry Chambers and Jerry Gant argue that the district court abused its discretion in denying defendant Larry Chambers' motion for change of venue due to prejudicial pretrial publicity. Fed.R.Crim.P. 21(a). The principal basis for their claim relates to the television news broadcasting of a home video seized during a police drug raid at the home of defendant Larry Chambers. On the video, Chambers and one M.C. Poole are discussing their enormous profits, presumably from narcotics trafficking, while Poole is counting the money. The video was broadcast in the Metropolitan Detroit area, and indeed elsewhere in the nation, several times prior to trial and during the time the jury selection was in progress. In addition, one local station had a week-long series on the Chambers Brothers Organization drug ring which was entitled, "All In the Family," and which was broadcast five months before Larry Chambers was arrested. The pervasive pretrial publicity, defendants argue, made selection of an impartial jury impossible and required a change of venue.
 
 
 59
 Defendants rely on Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), to contend that it must be presumed that the pretrial publicity made a fair trial impossible. In Rideau, the defendant's detailed confession was broadcast on a local television station three times within the two months before trial. The Supreme Court held that, in reality, Rideau's trial occurred on television, not in the courtroom. Id. at 726, 83 S.Ct. at 1419.
 
 
 60
 In Rideau, prejudice was presumed because the influence of the media pervaded the proceedings. Murphy v. Florida, 421 U.S. 794, 798-99, 95 S.Ct. 2031, 2035-36, 44 L.Ed.2d 589 (1975). However, Rideau is the exception not the rule. A juror's exposure to news accounts about the crime charged, standing alone, does not presumptively establish that the defendant was denied a fair trial. Murphy, 421 U.S. at 799, 95 S.Ct. at 2035. Fairness requires that the defendant be tried by an impartial, indifferent jury. Id. The test for change of venue due to pretrial publicity does not depend on the amount of media coverage but rather whether " 'the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " Murphy, 421 U.S. at 800, 95 S.Ct. at 2036 (quoting Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)); see also United States v. Johnson, 584 F.2d 148, 154 (6th Cir.1978), cert. denied, 440 U.S. 918, 99 S.Ct. 1239, 1240, 59 L.Ed.2d 469 (1979).
 
 
 61
 The jury voir dire in this case was extensive: prospective jurors completed questionnaires; each defendant was given fourteen peremptory challenges; and the judge was very lenient in granting challenges for cause. Defendants cite to several portions of the transcript where jurors admitted they had heard about the case or expressed fear about serving on the jury. The record reveals that these jurors were excused, unless they stated they could remain impartial, presume defendants' innocent, and render a verdict based on the evidence at trial. The district court went to great lengths to insure that the impaneled jurors were not influenced by any pretrial publicity. We note that the defendants did not use all of their peremptory challenges. The district court did not abuse its discretion in denying the change of venue motion. Cf. United States v. Ebens, 800 F.2d 1422, 1426-27 (6th Cir.1986).
 
 C.
 
 62
 Motion for Mistrial Following Recantation of Testimony
 
 
 63
 Perry Coleman testified at trial under a plea agreement that reduced his sentence for conspiracy to deliver cocaine from twenty years to five years imprisonment. His testimony linked Billy Joe Chambers, Willie Chambers, and Jerry Gant to the drug conspiracy. After an overnight recess, Coleman again took the stand and testified, out of the presence of the jury, that he was concerned for his own safety and that of his wife, and that the previous day he lied about "everything." The district court found that Coleman was unworthy of belief and ordered his testimony stricken from the record. As a result, the government dismissed the indictment against two of the defendants.
 
 
 64
 Defendants moved for mistrial because Coleman testified for about thirty minutes and his testimony was damaging and prejudicial. The government countered that the jury would be instructed to disregard the testimony and that there was other overwhelming evidence of the remaining defendants' involvement in the conspiracy. The district court denied the motion for mistrial, and instructed the jury as follows:
 
 
 65
 Ladies and gentlemen, yesterday when we broke Perry Coleman was on the witness stand. You are to disregard anything he has said, anything he has said whatsoever. If you have notes on what he has said tear them out, throw them away when you go back in there. They are nothing for you to consider one way or the other in this matter whatsoever. I want you to erase it from your mind as if he was never in this courtroom.
 
 
 66
 On appeal, Billy Joe Chambers argues that the curative instruction was inadequate to erase the prejudice that resulted from Coleman's testimony and that the district court abused its discretion in failing to declare a mistrial.
 
 
 67
 We review the denial of a motion for mistrial for an abuse of discretion. United States v. Atisha, 804 F.2d 920, 926 (6th Cir.1986), cert. denied, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987). "[A] determination of the fairness to the accused is the primary concern in ruling upon a mistrial motion...." Id. Generally, "the subsequent striking of erroneously admitted evidence accompanied by a clear and positive instruction to the jury to disregard it cures the error" unless the stricken evidence is so prejudicial that its harmful effect cannot be eliminated. United States v. Greene, 400 F.2d 847, 848 (6th Cir.1968).
 
 
 68
 In this case, Coleman's testimony was introduced by the government in good faith and only the next day, when the witness professed fear for his own safety and that of his family, did he recant. The court's clear and direct curative instruction was promptly given and we are offered no logical reason to conclude that the jurors were unwilling or unable to obey it. Moreover, a number of other witnesses testified as to Billy Joe Chambers' involvement in the conspiracy; thus Coleman's testimony could be regarded as merely cumulative. Accordingly, we conclude that the testimony was not so singular or prejudicial that the court's instruction could not cure its admission. Cf. United States v. Bowers, 739 F.2d 1050, 1055 (6th Cir.), cert. denied, 469 U.S. 861, 105 S.Ct. 195, 83 L.Ed.2d 128 (1984). The district court did not abuse its discretion in refusing to grant a mistrial.
 
 D.
 
 69
 Motion for a New Trial Based on the Recantation of Testimony
 
 Given at Trial by Terry Colbert
 
 70
 Some five months after the guilty verdicts, defendants filed a motion for new trial based on newly discovered evidence. Fed.R.Crim.P. 33. Attached to the motion was an affidavit from Terry Colbert, a government informant and witness at trial. Colbert's affidavit stated that many of his statements at trial were untrue and that he was pressured by the government to cooperate or face a long prison sentence. The affidavit specifically recanted facts about Billy Joe, Larry, and Willie Chambers.
 
 
 71
 Colbert testified at a posttrial evidentiary hearing conducted by the district court on June 14, 1989. At the conclusion of the hearing, the district judge stated that he was skeptical of Colbert's hearing testimony and thought that Colbert's fear of the Chambers organization was greater than his fear of incarceration. In its written opinion, the court found Colbert's recantation totally incredible:
 
 
 72
 Mr. Colbert's "recantation" consists of numerous contradictions and several claims that his testimony at trial was exaggerated.... Mr. Colbert confirmed that the Chambers organization was selling "crack" cocaine but simply claimed he lied at trial about the scope of the organization....
 
 
 73
 Mr. Colbert's testimony ... is further contradicted by the testimony of numerous law enforcement officers who made drug arrests of members of the Chambers organization based on information acquired from Mr. Colbert. In addition, the testimony of Deputy Marshal Scott Dyer supplies substantial motive for fabricating the recent recantation. During an interview with Deputy Marshal Dyer on May 19, 1989, Mr. Colbert told Dyer "you don't know what it's like on the street ... you did not lock them all up." Mr. Colbert also stated he feared for his family....
 
 
 74
 Finally, Mr. Colbert's trial testimony was consistent with the testimony of numerous ... other government witnesses. [The court listed some examples of the consistencies.]
 
 The court concluded:
 
 75
 Based on these consistencies between Mr. Colbert's trial testimony and the testimony of at least ten other witnesses, Mr. Colbert's demeanor during both occasions, and Mr. Colbert's motive to fabricate the recantation, the Court finds Mr. Colbert's trial testimony to be credible and Mr. Colbert's recent recantation to be wholly unbelievable.
 
 
 76
 This court reviews a denial of a motion for new trial for an abuse of discretion. United States v. Barlow, 693 F.2d 954, 966 (6th Cir.1982), cert. denied, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983). A motion for new trial based on newly discovered evidence requires the defendant to show that "the evidence (1) was discovered only after trial, (2) could not have been discovered earlier with due diligence, (3) is material and not merely cumulative or impeaching, and (4) would likely produce an acquittal if the case were retried." Id.
 
 
 77
 Recanting affidavits and witnesses are viewed with extreme suspicion. United States v. Kearney, 682 F.2d 214, 219 (D.C.Cir.1982) (citing United States v. Lewis, 338 F.2d 137 (6th Cir.1964), cert. denied, 380 U.S. 978, 85 S.Ct. 1342, 14 L.Ed.2d 272 (1965)).
 
 
 78
 In considering a motion for new trial based on the contention that an affidavit by a recanting witness constitutes newly discovered evidence the first test to be applied by the judge is whether the court is reasonably well satisfied that the prior testimony was false. Gordon v. United States, 178 F.2d 896, 900 (6th Cir.1949). If that first and primary ground is not satisfied, the primary ground for granting the new trial is lacking. Id.
 
 
 79
 Kearney, 682 F.2d at 220.
 
 
 80
 In this case, the district court had the opportunity to observe Colbert's demeanor and assess his credibility both at trial and at the evidentiary hearing. The court was uniquely qualified to pass on Colbert's credibility. Particularly given the court's reasons for rejecting Colbert's recantation, we defer to the court's judgment. United States v. Adi, 759 F.2d 404, 408-09 (5th Cir.1985).
 
 
 81
 We conclude the district court did not abuse its discretion in denying the motion for new trial.
 
 E.
 
 82
 Refusal to Permit Testimony at the Hearing on the Motion for New Trial
 
 
 83
 At the hearing on the motion for new trial based on Colbert's recantation, Larry Chambers, against the advice of counsel, asked to be permitted to testify in order to corroborate some of Colbert's statements; namely, that the cocaine "was planted on him" and that he was a victim of "police brutality." The court refused to permit the testimony as improper upon a motion for new trial based on newly discovered evidence because defendant could have testified at trial about the matters he wished to raise in the posttrial hearing, and that the matters were not, therefore, newly discovered evidence. Larry Chambers also wanted to refute the government's allegation that Colbert was threatened by someone in the Chambers organization. The court found that such testimony raised merely a credibility issue. The court stated that it would allow defendant to testify if he could show that his testimony would be proper for a new trial motion but that the court declined to retry the case. Defense counsel responded that he would proceed by affidavit.
 
 
 84
 On appeal, Larry Chambers contends that his proffered testimony was relevant and that the district court erred in denying him his "constitutional right" to testify at the posttrial hearing.
 
 
 85
 The Constitution guarantees a defendant the right to testify on his own behalf at a criminal trial. Rock v. Arkansas, 483 U.S. 44, 51-53, 107 S.Ct. 2704, 2708-09, 97 L.Ed.2d 37 (1987). Moreover, the constitutional procedural due process required at some extrajudicial proceedings, such as parole or probation revocation hearings or hearings on the termination of welfare benefits, also include the right to testify on one's own behalf. Id. at 51 n. 9, 107 S.Ct. at 2709 n. 9. However, the defendant fails to cite any authority that the constitutional right to testify extends to a motion for new trial hearing, and particularly not upon matters of which the defendant had knowledge at the time of trial.
 
 
 86
 The district court did not err in denying defendant's request to testify. The court gave defendant the opportunity to convince the court that the testimony was proper, and rather than presenting further arguments, defendant elected to proceed by affidavit.
 
 F.
 Claim of Withdrawal from the Conspiracy
 
 87
 Elayne Coleman Lucas contends that the evidence establishes that she withdrew from the conspiracy on September 3, 1984, the date she was arrested. On that date, she told the authorities that she had sold crack cocaine. There was no evidence presented at trial that she was involved in the conspiracy after the date of her arrest. Lucas contends the district court erred in refusing to instruct the jury that she had withdrawn from the conspiracy.
 
 
 88
 Withdrawal from a conspiracy is an affirmative defense. United States v. Battista, 646 F.2d 237, 246 (6th Cir.), cert. denied, 454 U.S. 1046, 102 S.Ct. 586, 70 L.Ed.2d 488 (1981).
 
 
 89
 Mere cessation of activity in furtherance of an illegal conspiracy does not necessarily constitute withdrawal. The defendant must present evidence of some affirmative act of withdrawal on his part, typically either a full confession to the authorities or communication to his co-conspirators that he has abandoned the enterprise and its goals.
 
 
 90
 United States v. Steele, 685 F.2d 793, 803-04 (3d Cir.), cert. denied, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982). See also, Battista, 646 F.2d at 246.
 
 
 91
 On September 1, 1984, a police officer made a controlled purchase of crack cocaine from Lucas at the upstairs flat of a two-family home on Gray Street in Detroit. Two days later, the police raided the home and arrested Lucas upstairs and Billie Lee Chambers downstairs. Lucas made a statement to the police in which she admitted selling $100 worth of cocaine, but otherwise provided little information. She said the cocaine was there when she arrived at the home, she was let in by a female friend, she left the money there, and did not know who lived downstairs.
 
 
 92
 To establish withdrawal from a conspiracy, the defendant must show an affirmative act establishing withdrawal. The absence of proof that Lucas continued in the conspiracy after her arrest does not require a finding that she withdrew. Lucas' statement does not amount to an affirmative act of withdrawal from the conspiracy. Her statement is not a full confession and, in fact, evidences a lack of cooperation with authorities.
 
 
 93
 Withdrawal is not a defense when the object of the conspiracy has been completed, or the defendant has committed an overt act toward its completion. United States v. Collins, 779 F.2d 1520 (11th Cir.1986). There was evidence that prior to her purported statement of withdrawal, Lucas had been selling narcotics for over a month and had sold cocaine to an undercover officer. Lucas' attempt, after her arrest, to withdraw from the conspiracy did not affect her active involvement in the enterprise prior to that date.
 
 G.
 Sufficiency of the Evidence of Conspiracy
 
 94
 Willie and Otis Chambers, and Lucas claim there was insufficient evidence to tie them to the conspiracy. This court reviews a sufficiency of the evidence claim by determining "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (emphasis in original), reh'g denied, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979).
 
 1.
 Willie Chambers
 
 95
 Willie Chambers contends that since the only testimony linking him to the conspiracy is the testimony of Terry Colbert, the witness who recanted his testimony after the trial, the evidence is insufficient to convict him of conspiracy. This claim is dependent, of course, upon the success of the earlier argument that Colbert's recanted testimony should result in a new trial. However, we have found that the district court did not abuse its discretion in denying defendants' new trial motion and we accept the court's conclusion that Colbert's trial testimony implicating Willie Chambers was credible. Therefore, Willie Chambers' sufficiency of the evidence claim must be rejected.
 
 2.
 Otis Chambers
 
 96
 Otis Chambers contends that the evidence was insufficient to show he was a member of any drug conspiracy and that in order to convict him of conspiracy, the jury had to build inference upon inference. He also asserts that the district court failed to make the preliminary determination required for the admission of a co-conspirator's statement that a preponderance of the evidence established that a conspiracy existed, and that the co-conspirator's statement was made during the course of and in furtherance of the conspiracy. See Fed.R.Evid. 801(d)(2)(E); see also Bourjaily v. United States, 483 U.S. 171, 175, 180, 107 S.Ct. 2775, 2778, 2781, 97 L.Ed.2d 144 (1987); United States v. Enright, 579 F.2d 980, 984-85 (6th Cir.1978).
 
 
 97
 Three witnesses testified against Otis Chambers: Terry Colbert, Karen Hurst, and Police Chief Herbert Neighbors. Otis contends that the testimony of Colbert and Hurst was uncorroborated, and that the testimony of Chief Neighbors established mere association.
 
 
 98
 Terry Colbert testified that in July of 1986 or 1987, he was selling crack for Billy Joe Chambers at a house owned by his uncle on the west side of Detroit. Otis Chambers was a drop off and pick up man there. In July, Colbert's uncle got into an argument with Otis because the Chambers Organization owed his uncle rent money for using his house to sell crack. Otis left and returned a half hour later with four men; one struck the uncle with a baseball bat and another, at Otis' direction, shot him twice in the leg.
 
 
 99
 Karen Hurst testified that in late summer of 1986 she was in the basement of a house on Wilfred with Billy Joe, Otis and others. She had bought a set of glass pots and six boxes of baking soda. Otis was taking the glass pots out of the carton when she left. On another occasion at the house, she saw white powder on a wooden table and two men were mixing in baking soda. Otis was present, speaking on the telephone.
 
 
 100
 The proofs at trial indicated that the Chambers Organization recruited members from Marianna, Arkansas, the Chambers brothers' hometown. Hughes, Arkansas is twenty-two miles north of Marianna, Arkansas. Hughes, Arkansas Police Chief Neighbors testified that on April 24, 1987, at 4:00 p.m., he and his partner stopped a blue Corvette for running a stop sign. The female driver had no license or identification. The male passenger was Otis Chambers. Otis said he borrowed the car from a friend to drive from Detroit to Marianna to visit his people. Both driver and passenger were taken to the police station in the patrol car and Chief Neighbors followed in the Corvette. Behind the Corvette's passenger seat was a large plastic garbage bag containing $59,624. The money was confiscated by the IRS.
 
 
 101
 Manifestly, the evidence is sufficient to establish that Otis was a member of the conspiracy for purposes of the admission of any statements by a co-conspirator, and for a rational jury to conclude that defendant's membership was proven beyond a reasonable doubt.
 
 3.
 Elayne Coleman Lucas
 
 102
 Lucas argues that there was insufficient evidence to show that she was a member of the conspiracy. Lucas notes that when the government introduced the statement she made following her arrest, the government's attorney, in response to an objection by counsel for a codefendant, stated, "[t]he confession is not to the conspiracy but it is admissible as to a cocaine seller and Elaine [sic] Coleman is a cocaine seller." Lucas contends that this response establishes that the government abandoned its theory that she was a member of the conspiracy.
 
 
 103
 Lucas does not contest the evidence establishing the existence of a conspiracy but rather contends the evidence is insufficient to show she was a member of it. "Once a conspiracy is established, only slight evidence is necessary to connect a defendant with it." United States v. Votteller, 544 F.2d 1355, 1359 (6th Cir.1976).
 
 
 104
 Terry Colbert testified that in a two-family flat on Gray Street in Detroit, the Chambers Organization was making crack cocaine downstairs and selling it upstairs. He testified that Lucas sold crack from the upstairs flat in August 1984 and that she sold it for about a month. Lucas ran the upstairs sales operation and Billy Joe Chambers ran the downstairs manufacturing operation. Officer John Autrey testified that he purchased three bags of cocaine from Lucas at the Gray Street upstairs flat on September 1, 1984. On September 3, officers raided the upstairs flat and arrested Lucas after she had fled to the lower flat. In the lower flat, the officers discovered Billy Joe Chambers and others preparing crack cocaine. Thus, even absent her statement following her arrest, there is sufficient evidence to establish that Lucas was a member of the drug conspiracy.
 
 H.
 
 105
 Sufficiency of the Evidence Concerning Use of a Firearm
 
 
 106
 during a Drug Trafficking Offense
 
 
 107
 On December 19, 1987, a search warrant was executed on an apartment on East Outer Drive in Detroit. Larry Chambers was found in the bathroom; no one else was in the apartment. Chambers had keys to the apartment. Cocaine was seized from the kitchen. A firearm was found in an open cupboard above the stove in the kitchen. On appeal, Larry Chambers contends there was insufficient evidence to establish he had actual possession of the firearm.
 
 18 U.S.C. § 924(c)(1) provides in part:
 
 108
 Whoever, during and in relation to any ... drug trafficking crime ..., uses or carries a firearm, shall ... be sentenced to imprisonment for five years....
 
 This circuit has held:
 
 109
 [I]f it reasonably appears that the firearms found on the premises controlled or owned by a defendant and in his actual or constructive possession are to be used to protect the drugs or otherwise facilitate a drug transaction, then such firearms are used "during and in relation to" a drug trafficking crime.
 
 
 110
 United States v. Henry, 878 F.2d 937, 944 (6th Cir.1989). This circuit has also held that "the statute does not require actual physical possession of a weapon or that the defendant actually brandished the weapon in the commission of a drug offense." United States v. Acosta-Cazares, 878 F.2d 945, 952 (6th Cir.), cert. denied, 493 U.S. 899, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989). We noted that " 'uses' and 'carries' should be construed broadly to cover the gamut of situations where drug traffickers have ready access to weapons with which they secure or enforce their transactions." Id.
 
 
 111
 Police found defendant alone in the apartment, cocaine was on the kitchen table, and a gun was in an open nearby cupboard. As this court stated in Acosta-Cazares:From this evidence, a jury could reasonably infer that defendant used weapons during the conspiracy and in connection with the substantive drug offenses. Viewing the evidence in the light most favorable to the government, the evidence links defendant to the weapons and the weapons to the underlying drug trafficking convictions.
 
 
 112
 Id.
 
 
 113
 Therefore, we conclude that Larry Chambers' claim based upon insufficiency of the evidence lacks merit.
 
 I.
 
 114
 Conspiracy and Continuing Criminal Enterprise
 
 
 115
 Billy Joe and Larry Chambers were convicted of conspiracy to distribute and to possess with the intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846, and of operating a continuing criminal enterprise, in violation of 21 U.S.C. § 848. Billy Joe was sentenced to concurrent terms of 365 months imprisonment and five years supervised release. Larry was sentenced to concurrent life terms, a consecutive five-year term for possession of a firearm during a drug trafficking offense, and five years supervised release. On appeal, they argue that conspiracy is a lesser included offense of continuing criminal enterprise and, therefore, punishment for both offenses violates the Double Jeopardy Clause. Both defendants ask this court to remand for resentencing. In addition, Larry Chambers requests that we vacate the conspiracy conviction and remand for resentencing on continuing criminal enterprise.
 
 
 116
 The government concedes that the convictions for both conspiracy and continuing criminal enterprise cannot stand and the case must be remanded to the district court for dismissal of one of the convictions. However, the government argues that the district court has the discretion to vacate either the conspiracy or the continuing criminal enterprise conviction. In support of its argument that the continuing criminal enterprise conviction should be vacated, the government states:
 
 
 117
 Because of an anomaly in the sentencing guidelines, Larry Chambers' adjusted offense level for conspiracy is 40, while his adjusted offense level for CCE is only 36, making the conspiracy charge more serious than CCE.[7] It would be an odd result, to say the least, for Larry and Billy Joe Chambers to receive a benefit as a result of being convicted of both CCE and conspiracy, instead of only the ordinarily less serious conspiracy charge.
 
 
 118
 In Jeffers v. United States, 432 U.S. 137, 153, 155, 97 S.Ct. 2207, 2217, 2218, 53 L.Ed.2d 168 reh'g denied, 434 U.S. 880, 98 S.Ct. 241, 54 L.Ed.2d 164 (1977), the Supreme Court held that a defendant could be tried on multiple narcotic offenses arising from the same acts without raising a double jeopardy question even if some offenses are lesser included offenses of others; however, Congress did not intend to allow cumulative punishment for violations of section 846, conspiracy, and section 848, continuing criminal enterprise. In Ball v. United States, 470 U.S. 856, 864-65, 105 S.Ct. 1668, 1673, 84 L.Ed.2d 740 (1985), the Supreme Court held the district court cannot merely order the convictions be served concurrently; rather, the district court must exercise its discretion and vacate one of the sentences.
 
 
 119
 In United States v. Schuster, 769 F.2d 337, 345 (6th Cir.1985), cert. denied, 475 U.S. 1021, 106 S.Ct. 1210, 89 L.Ed.2d 322 (1986), this court remanded the case and instructed the district court to vacate the convictions for conspiracy, which is a lesser included offense of continuing criminal enterprise, and merge the convictions into the continuing criminal enterprise offense. In United States v. Davis, 809 F.2d 1194, 1204-05 (6th Cir.), cert. denied, 483 U.S. 1007, 107 S.Ct. 3234, 3235, 97 L.Ed.2d 740 (1987), this court again upheld the continuing criminal enterprise conviction and remanded with instructions to dismiss the conspiracy convictions.
 
 
 120
 Other circuits agree that in such circumstances, the convictions and sentences for conspiracy, the lesser included offense of continuing criminal enterprise, must be vacated. See United States v. Grubbs, 829 F.2d 18, 19 (8th Cir.1987); United States v. Brantley, 733 F.2d 1429, 1436 (11th Cir.1984), cert. denied, 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985); United States v. Jefferson, 714 F.2d 689, 703-06 (7th Cir.1983); see also United States v. Buckley, 586 F.2d 498, 505 (5th Cir.1978), cert. denied, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 242 (1979); United States v. Rosenthal, 454 F.2d 1252, 1255 (2d Cir.), cert. denied, 406 U.S. 931, 92 S.Ct. 1801, 32 L.Ed.2d 134 (1972).
 
 
 121
 None of those cases discuss, however, any reason for selecting the conspiracy conviction, rather than the continuing criminal enterprise conviction, for dismissal except to observe that the conspiracy offense is the "lesser" of the two. In this case, however, measured by the guidelines-prescribed sentences at least, conspiracy is not the less serious offense because of what the government calls "an anomaly in the sentencing guidelines," although it is, in terms of its elements, included in the criminal enterprise offense.
 
 
 122
 Larry Chambers' adjusted offense level for conspiracy is 40, while his adjusted offense level for continuing criminal enterprise is only 36. Chambers wants the conspiracy conviction vacated, and the government wants the continuing criminal enterprise conviction vacated. There being no binding precedent directly controlling the matter, we think it is a decision for the trial court to make. We shall, therefore, remand Billy Joe and Larry Chambers' convictions for conspiracy and continuing criminal enterprise, with instructions that the district court vacate one of the two convictions and its corresponding sentence in each defendant's case. The district court must also consider what, if any, effect the vacated conviction and sentence will have upon sentences imposed under the guidelines for each defendant's other convictions. See, e.g., U.S.S.G. § 3D1.2(d).
 
 J.
 Sentencing Guidelines Issues
 1.
 Ex Post Facto Clause
 
 123
 Willie and Otis Chambers, and Lucas argue that the sentencing guidelines do not apply to them because there was no evidence presented at trial to show they committed any illegal act after November 1, 1987, the effective date of the sentencing guidelines. Relying on Miller v. Florida, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), the defendants contend that the use of the sentencing guidelines violates the Ex Post Facto Clause of the Constitution. Therefore, defendants ask that we vacate the sentences imposed under the guidelines and remand to the district court for resentencing.
 
 
 124
 Courts addressing the issue have held that the sentencing guidelines apply to a conspiracy that began before November 1, 1987, but continued past November 1, 1987, the effective date of the guidelines. These courts reason that the Ex Post Facto Clause is not violated by applying the sentencing guidelines when the conspiracy continues after the effective date of the guidelines because conspiracy is a continuing offense. See, e.g., United States v. Terzado-Madruga, 897 F.2d 1099, 1124 (11th Cir.1990); United States v. Sheffer, 896 F.2d 842, 844 (4th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 432, 112 L.Ed.2d 416 (1990); United States v. Tharp, 892 F.2d 691, 693 (8th Cir.1989); United States v. White, 869 F.2d 822, 826 (5th Cir.), cert. denied, 490 U.S. 1112, 109 S.Ct. 3172, 104 L.Ed.2d 1033 (1989). A defendant may avoid being sentenced under the guidelines only if the defendant can show that the withdrawal from the conspiracy occurred before November 1, 1987. See United States v. Williams, 897 F.2d 1034, 1040 (10th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2064, 114 L.Ed.2d 469 (1991); United States v. Rosa, 891 F.2d 1063 (3d Cir.1989); see also Sentencing Guideline Commission, "Questions Most Frequently Asked About The Sentencing Guidelines," March 1990, Questions 41, 51.
 
 
 125
 In this case, the indictment alleges that the conspiracy began before and continued after November 1, 1987. The evidence does not show that the defendants withdrew from the conspiracy before November 1, 1987. Therefore, defendants were properly sentenced under the guidelines.
 
 2.
 Acceptance of Responsibility
 
 126
 Otis Chambers argues that he is entitled to a two-point reduction in the calculation of his offense level under the sentencing guidelines because he told the probation officer that he accepted responsibility, although he concedes that he would not provide a detailed statement of his role. Otis contends the failure to give him the two-point reduction penalizes him for exercising his Fifth Amendment right against self-incrimination.
 
 
 127
 Section 3E1.1(a) of the sentencing guidelines provides:
 
 
 128
 If the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct, reduce the offense level by 2 levels.
 
 
 129
 The guidelines apply to both guilty pleas and trial convictions and do not require the reduction be given as a matter of right even if the defendant enters a guilty plea. U.S.S.G. § 3E1.1(b) and (c). The Commentary explains:
 
 
 130
 The reduction of offense level provided by this section recognizes legitimate societal interests. For several reasons, a defendant who clearly demonstrates a recognition and affirmative acceptance of personal responsibility for the offense by taking, in a timely fashion, one or more of the actions listed above (or some equivalent action) is appropriately given a lesser sentence than a defendant who has not demonstrated sincere remorse.
 
 
 131
 U.S.S.G. § 3E1.1, comment. (backg'd). The sentencing judge's determination of a defendant's acceptance of responsibility should be given great deference and should not be disturbed on appeal unless it is without foundation. U.S.S.G. § 3E1.1, comment. (n.5). The determination is one of fact and, therefore, is subject to the clearly erroneous standard of review. United States v. Gordon, 876 F.2d 1121, 1127 (5th Cir.1989); 18 U.S.C. § 3742(e).
 
 
 132
 In White, 869 F.2d at 825-26, the court found that the reduction for acceptance of responsibility did not violate the defendant's Sixth Amendment right to a jury trial. The court held:
 
 
 133
 [I]t is not unconstitutional for the government to bargain for a guilty plea in exchange for a reduced sentence. The guideline, in fact, does not guarantee that a defendant who pleads guilty will receive a lower sentence.... The fact that a more lenient sentence is imposed upon a contrite defendant does not establish a corollary that those who elect to stand trial are penalized.
 
 
 134
 Id. at 826 (citations omitted). In Gordon, 876 F.2d at 1127-28, the court held its decision in White foreclosed the defendant's argument that section 3E1.1 placed an unconstitutional burden on his Sixth Amendment right to a jury trial and his Fifth Amendment right to silence.
 
 
 135
 In United States v. Monsour, 893 F.2d 126, 129 (6th Cir.1990), this circuit recognized that courts have historically considered sincere remorse as a factor calling for leniency in sentencing and joined those courts which have uniformly upheld the constitutionality of section 3E1.1.
 
 
 136
 Based on the foregoing, we conclude that section 3E1.1 does not violate a defendant's Fifth Amendment right against self-incrimination. Moreover, the sentencing court did not clearly err in failing to reduce Otis' sentence for acceptance of responsibility based on his statements to the probation officer. Otis would not admit his involvement in the conspiracy. His purported acceptance of responsibility came just before sentencing, and the sentencing court found it to be insincere.
 
 
 137
 This case is distinguishable from United States v. Perez-Franco, 873 F.2d 455 (1st Cir.1989), cited by defendant. In Perez-Franco, the defendant pled guilty to one of the five charges under a plea agreement with the government. At sentencing, the defendant accepted responsibility and explained his involvement in the offense to which he had pleaded guilty to, but refused to accept responsibility for the four offenses to which he did not plead guilty. The sentencing court required complete disclosure of all criminal conduct and refused to apply the two-point reduction. The court of appeals reversed, finding that the guidelines required only that the defendant accept responsibility for the offense to which he pled guilty. Unlike Perez-Franco, the court below did not demand that Otis Chambers explain his involvement in charges of which he was not convicted. Instead, Chambers refused to explain his involvement in the offenses that supported his conviction.
 
 3.
 Major Participant
 
 138
 A jury convicted Marshall Glenn of conspiracy to possess with the intent to distribute and to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846. The court sentenced Glenn to 360 months imprisonment and five years supervised release. Glenn disputes the offense level calculation. He argues that the evidence failed to establish that he was anything but a minor participant and he asserts that the court erred in increasing the offense level by three points for his role as a major participant. U.S.S.G. § 3B1.1.
 
 
 139
 Section 3B1.1 increases the offense level based upon the size of the criminal organization and the role defendant played in committing the offense. Section 3B1.1(b) provides:
 
 
 140
 If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
 
 
 141
 The commentary to section 3B1.1 suggests that the court should consider "the nature of participation in the commission of the offense, the recruitment of accomplices, ... and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, comment. (n.3).
 
 
 142
 Terry Colbert and James McKinney testified against Glenn at trial. Glenn contends their testimony, at best, established that Glenn was a drop off/pick up man; cooked and cut up crack cocaine at two houses; recruited McKinney from Marianna, Arkansas; drove McKinney to Detroit; and had McKinney sell crack. Glenn argues his participation in the conspiracy was not unlike the roles of Karen Hurst and James Lumpkin, persons the government identified as minor players. In sum, Glenn challenges the court's factual finding that Glenn was a manager or supervisor in the Chambers Organization.
 
 
 143
 The presentence report indicated that Glenn's participation in the conspiracy was similar to the involvement of Willie Lee and Otis Chambers, Belinda Lumpkin, Jerry Lee Gant, and Eric Lamar Wilkins. Glenn was a drop off and pick up man, a lieutenant who oversaw crackhouses, and a recruiter of Marianna, Arkansas, youngsters for the Chambers Organization. The presentence report recommended a three-point upward adjustment because of Glenn's role as a lieutenant, enforcer, and supervisor. See U.S.S.G. § 3B1.1(b).
 
 
 144
 At sentencing, responding to the identical objection Glenn raises on appeal, the district court held:
 
 
 145
 [Glenn] solicited one of the people from Marianna and was involved in supervising one of the houses, he did recruit a person, at least from the proofs. Therefore, I find the guidelines correct.
 
 
 146
 Appellate review of sentences imposed under the guidelines is limited.
 
 
 147
 The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts.
 
 
 148
 18 U.S.C. § 3742(e). Under the guidelines, the government need only prove, by a preponderance of the evidence, those facts the court should rely on in determining the sentence. United States v. Carroll, 893 F.2d 1502, 1506 (6th Cir.1990).
 
 
 149
 Glenn concedes there is evidence to support his involvement in the conspiracy but argues that the proof establishes that he was involved as a minor participant rather than a manager or supervisor. The sentencing court found otherwise and the court's finding is not clearly erroneous based on the evidence presented.
 
 K.
 
 150
 Prosecutorial Misconduct and Ineffective Assistance of Counsel
 
 
 151
 Acting pro se, Larry Chambers argues that the government engaged in prosecutorial misconduct during trial because the United States Attorney drew a picture of the courtroom for Terry Colbert and indicated where the defendants were sitting, and that during Colbert's testimony, the United States Attorney nodded his head and winked at Colbert. The law is clear that the alleged misconduct must render the trial fundamentally unfair. Paprocki v. Foltz, 869 F.2d 281, 288 (6th Cir.1989). This court examines the asserted misconduct's pervasiveness, egregiousness, deliberateness, and weighs it in light of the evidence of guilt. Id. "A prosecutor may conduct himself in a manner that 'deserves ... condemnation,' but still is not egregious enough to deprive the defendant of a fair trial." Id. (citation omitted). The alleged misconduct here, even if true, did not render the trial fundamentally unfair.
 
 
 152
 Acting pro se, Billy Joe Chambers argues that he was denied effective assistance of counsel because counsel failed to object to the introduction of certain evidence obtained from purported crackhouses run by the Chambers Organization. Under the test set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 reh'g denied, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984), a Sixth Amendment ineffective assistance of counsel claim requires that the defendant establish that counsel did not perform as well as a reasonably prudent lawyer, and that but for counsel's deficient performance defendant had a reasonable likelihood of acquittal. Id. 466 U.S. at 690, 692, 104 S.Ct. at 2066, 2067. Effective assistance is presumed and the court will not question matters which involve trial strategy. Id. at 692, 104 S.Ct. at 2067. Billy Joe fails to meet the Strickland test. He cannot show the requisite prejudice.
 
 III.
 
 153
 The convictions of Lumpkin and Wilkins are VACATED. Their cases are REMANDED to the district court for a hearing and for disposition as described in part II-A.
 
 
 154
 The convictions and sentences of Billy Joe Chambers and Larry Chambers for conspiracy and continuing criminal enterprise are REMANDED to the district court for disposition as described in part II-I.
 
 
 155
 All other convictions and sentences are AFFIRMED.
 
 
 
 *
 The Honorable Henry R. Wilhoit, Jr., United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 After certification, the court, depending upon the circumstances 1) must ensure that special procedures pertaining only to juveniles are followed, or 2) may direct that a juvenile be prosecuted without special protections, in the same manner as an adult. See 18 U.S.C. § 5032
 
 
 [2]
 We certainly recognize that the existence of juvenile jurisdiction depends upon the age of a person, but that reality does not imply that a determination of juvenile jurisdiction is a determination of personal jurisdiction. The federal courts' diversity jurisdiction, for example, depends upon the citizenship or residency of persons, but that reality does not imply that a determination regarding diversity jurisdiction is a determination regarding personal jurisdiction
 
 
 [3]
 The district court also would have been obliged to seal the records of the proceedings already completed in the district court and to take all other available measures to secure the juveniles' rights to special procedural safeguards under the Act. Lumpkin and Wilkins did not completely waive their rights to protection under the Act since they asserted their rights promptly in relation to the government's motion to proceed against them as adults. A juvenile may effect an express waiver of his or her opportunity to be proceeded against as a juvenile only by means of a written request made upon advice of counsel. 18 U.S.C. § 5032. Similarly, the courts should be reluctant to find an implied waiver of a juvenile's opportunity to be proceeded against as a juvenile
 
 
 N7
 This anomaly was corrected in the November 1, 1989 amendments to the sentencing guidelines