**UNITED STATES of America, Plaintiff,**

v.

**Donald Lee EARLES and Catherine Papajohn, Defendants.**

**No. CR 91–4016–MWB.**

United States District Court,
N.D. Iowa,
Western Division.

Nov. 4, 1997.

James A. Meade, Trial Atty., Dept. of Justice, Washington, DC, Willis Buell, Asst. U.S. Atty., Souix City, IA, for U.S.

·James J. Beery, Norwalk, IA, for Defendant Earles.

Stanley E. Munger, Jay E. Denne of Munger & Reinschmit, Souix City, IA. for Defendant Papajohn.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS FOR NEW TRIAL

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ........................................1240
 A. Procedural Background .........................1240
 B. Factual Background ...........................1241

II. LEGAL ANALYSIS ...................................1245
 A. Standards For A New Trial ....................1245
 1. Grounds ..................................1245
 2. "Newly discovered evidence" ...............1246
 3. Discretion ...............................1247
 B. Recantation By A Witness .....................1248
 1. Skepticism ...............................1248
 2. Credibility, materiality, and impact on retrial .....1249
 3. Donnie Earles' recantation ...................1251
 a. "Newly discovered evidence" ..............1251
 b. Credibility, materiality, and impact on retrial ........1254
 i. Credibility ..........................1254
 ii. Materiality and impact on retrial ........1257

III. CONCLUSION .....................................1258

Skepticism greets any recantation of testimony by a witness in a criminal case, because where a witness later recants testimony given at trial, "the witness either is lying now, was lying then, or lied both times."[1] Some degree of skepticism, then, would greet the recantation here, even were it not by the son of one of the defendants, of some of the witness's grand jury testimony used at trial of the defendants on arson and mail fraud charges when the witness refused to testify. That portion of grand jury testimony, so the government asserted at the time of trial, was the critical link between the defendants and the arson fire at a grocery store owned by one of the defendants. The further twist here—apart from the filial relationship between the witness and the defendant—is that the grand jury testimony now being recanted was itself a "recantation" of *prior* grand jury testimony, in which the witness had asserted he knew nothing whatever about the fire. Certainly, heightened skepticism should be accorded a "re-recantation," particularly when it came only after the Eighth Circuit Court of Appeals held that the admission at trial of both versions of the witness's grand jury testimony was not erroneous. Yet,

---

1. *United States v. Provost*, 969 F.2d 617, 620 (8th Cir.1992) (citing *United States v. Bednar*, 776 F.2d 236, 238–39 (8th Cir.1985)), *cert. denied,* 506 U.S. 1056, 113 S.Ct. 986, 122 L.Ed.2d 139 (1993).

whatever degree of skepticism is appropriate here, skepticism does not mean prejudgment. Therefore, it is only after an evidentiary hearing at which the witness's latest recantation was reiterated, and after careful consideration of the witness's credibility, that this court finds itself prepared to rule on the defendants' motions for new trial based on the son's "newly discovered" re-recantation.

## I. INTRODUCTION

### A. Procedural Background

On May 26, 1995, defendants Donald Lee Earles and his companion Catherine Papajohn were convicted on a jury verdict on arson and mail fraud charges stemming from a fire on January 23, 1989, that destroyed an IGA store in Sloan, Iowa, owned by Papajohn and run by Earles.[2] On January 29, 1995, the trial judge, Senior Judge Donald E. O'Brien, granted the defendants' motions for judgment of acquittal on the ground that he had improperly admitted the grand jury testimony of Earles' son, Donald Scott Earles ("Donnie"),[3] when he refused to testify at trial. As a result of Donnie's refusal to testify at a prior trial of Papajohn, which ended in a mistrial, or at the second trial of Papajohn and Earles, which ended in convictions, Donnie was imprisoned for civil and criminal contempt of court. In a decision handed down on May 8, 1997, the Eighth Circuit Court of Appeals held that Donnie's grand jury testimony had been properly admitted, because Donnie was an "unavailable" witness owing to his refusal to testify and his grand jury testimony was admissible under the "catch-all" exception to the hearsay rule found in FED.R.EVID. 804(b)(5). *See United States v. Earles*, 113 F.3d 796 (8th Cir.1997),

*petition for cert. filed*, 66 U.S.L.W. 3204 (Sept. 16, 1997) (No. 97–505). The court of appeals therefore reversed the district court's judgment of acquittal and ordered the jury verdict convicting Earles and Papajohn reinstated. *Id.* On May 12, 1997, Judge O'Brien reassigned the case to the undersigned.

On May 15, 1997, Donnie, while represented by counsel, submitted to a telephone "deposition"—really just a statement under oath in question-and-answer form—conducted by Papajohn's defense counsel with "cross-examination" by Earles' defense counsel. The government was not given notice of or represented at the "deposition." At the evidentiary hearing, the defendants conceded that the procedure used to obtain Donnie's new statement was not a "deposition" in any usual sense. However, it is not the form, but the content of that "deposition" that matters here. In that "deposition," Donnie expressly recanted his prior grand jury testimony implicating his father and Papajohn in the fire that destroyed the IGA store. On June 17, 1997, Earles filed his motion for a new trial on the ground that Donnie's "deposition" was "newly discovered evidence" requiring a new trial. Papajohn's motion for new trial on the same ground followed on June 20, 1997.

On the basis of the Donnie's recantation in the "deposition," the court held an evidentiary hearing on the motions for new trial on October 28, 1997. The present ruling on the motions for new trial therefore relies on testimony presented at the evidentiary hearing, rather than upon the "deposition." At the evidentiary hearing, the United States was represented by counsel James A. Meade, Trial Attorney, Department of Justice, in Washington, D.C., and Willis Buell, Assistant United States Attorney, in Sioux City, Iowa.[4]

---

**2.** After fourteen days of trial, the jury convicted defendant Earles of (1) maliciously damaging and destroying the Countryside IGA in Sloan, Iowa; (2) aiding and abetting each of two counts of mail fraud; and (3) conspiring to maliciously damage and destroy the Countryside IGA and to commit mail fraud. Defendant Earles was acquitted by the jury of the two substantive counts of mail fraud. Defendant Papajohn was convicted of (1) aiding and abetting the malicious damage and destruction of the Countryside IGA; (2) two substantive counts of mail fraud; and (3) conspiring to maliciously damage and destroy the Countryside IGA and to commit mail fraud. The mail fraud in question involved approximate-

ly $188,665.00 in insurance benefits paid to Papajohn for the loss of the IGA store.

**3.** This moniker, adopted in the filings of the parties and at the hearing and oral arguments, is for the sake of conveniently distinguishing between defendant Donald Lee Earles and the recanting witness, his son, Donald Scott Earles.

**4.** The United States was permitted to appear via an attorney from the Department of Justice, because Donnie's recantation "deposition" suggested his purportedly false testimony had been coached and coerced by the prosecutor in the original trial in this matter, an assistant United

Defendant Earles was represented by counsel James J. Beery of Norwalk, Iowa. Defendant Papajohn was represented by counsel Stanley E. Munger and Jay E. Denne of Munger & Reinschmidt in Sioux City, Iowa. At the hearing, the defendants presented the testimony of Sharon McFall, Donnie's mother and defendant Earles' ex-wife, and Donnie himself. The United States did not present any witnesses. The parties also submitted as exhibits transcripts of Donnie's various appearances before the grand jury and at trial, the recantation "deposition," the transcript of a polygraph examination of Donnie conducted on or about June 12, 1991, and an "immunity letter" to Donnie dated June 18, 1991, from prosecutor Michael Hobart.

### B. Factual Background

Although the court will make additional findings of fact in its legal analysis, the court will here survey Donnie's grand jury testimony, admitted upon his refusal to testify in the trial of Earles and Papajohn, and his recantation of that testimony at the evidentiary hearing, as well as other pertinent evidence. Donnie's testimony admitted at Earles' and Papajohn's trial was drawn from his grand jury appearances on May 15, 1991, Government's Exhibit 1, and July 17, 1991, Government's Exhibit 2.[5]

On May 15, 1991, the gist of Donnie's grand jury testimony concerning his knowledge of the fire was as follows. Donnie was painting a truck in downtown Sloan, Iowa, on the evening preceding the fire at the IGA store. He testified that he saw his father's pickup truck in front of the IGA store during the evening, and that it was still there after midnight when Donnie went home. Donnie testified that his father's truck was parked there almost continuously from about 9:30 p.m. until Donnie went home. Donnie testified that he never talked to his father that night. However, Donnie ran out of gas in front of Catherine Papajohn's house, where Earles apparently also lived, near the IGA store, on Donnie's way home, and he refilled it from gas he knew would be in Papajohn's garage. It was while Donnie was refilling his truck and attempting to restart it that he noticed his father's truck was gone from the IGA store, but his father's truck had returned by the time Donnie got his own truck running. Donnie testified that his father told him the next day that he had locked up the store early on the morning of the fire and had later received a phone call that the store was on fire.

On May 15, 1991, Donnie also testified that his father ran the IGA store, although Papajohn owned it. He testified that his father never said the store had financial problems, but that it was "a pain in the butt always having to work on everything down there." Grand Jury Testimony of Donnie Earles, May 15, 1991, p. 16, *ll.* 8–9. However, when asked directly if he knew how the fire started at the IGA store, Donnie answered, "No. I have no idea." *Id.* at p. 20, *ll.* 15–16. Somewhat later, the following testimony was also elicited:

Q [by Mr. Hobart]. Do you have any knowledge of any facts that would indicate that the IGA store was not an arson, intentionally set?

A [by Donnie Earles]. If I had the knowledge, I would say. I just—I wouldn't put it past me if my father burned the store.

Q. But you don't have any personal knowledge?

A. He's got me in enough trouble in things that I know better that I've got involved, but I wouldn't put it past him if he did.

Q. But he's never admitted that to you?

A. No.

Q. Has Catherine Papajohn ever said anything to you or in your presence or that you've overheard that would indicate that she knew that it was going to be burned?

---

States attorney in the local United States Attorney's Office.

**5.** Donnie made a third appearance before a grand jury on April 5, 1994, at which he asserted his Fifth Amendment right against self-incrimina-

tion in response to any question concerning the fire at the IGA and asserted that he would not testify against his father at trial. Government Exhibit 3, Transcript of Grand Jury Testimony of Donnie Earles, April 5, 1994.

A. No. Them two stick together pretty tight. If they don[e] it, they don[e] it together on their own. And that they would do together, and it wouldn't be talked about. My dad is a good con, and she's pretty sharp herself.

Q. She's pretty good at business; isn't she?

A. I'd say she's pretty good at handling things.

Grand Jury Testimony of Donnie Earles, May 15, 1991, pp. 28–29. This testimony was admitted at Earles' and Papajohn's trial and is referred to herein as Donnie's "I know nothing" grand jury testimony.

On June 12, 1991, Donnie submitted to a polygraph examination concerning his knowledge of the fire at the IGA store. He was told that his answers were deceptive. Donnie then gave statements to law enforcement officials in which he gave a different version of what he knew about the fire. On June 18, 1991, Donnie was sent the so-called "immunity letter," Defendants' Exhibit B, in which Mr. Hobart requested that Donnie now provide truthful testimony to the grand jury. In the letter, Donnie was told that he was "being given one more chance in which to cooperate and give honest and truthful answers to questions propounded by law enforcement officials and by the United States Attorneys Office in front of the Grand Jury." Exhibit B, p. 1. Donnie was also told that, "[i]n return for complete and honest and truthful answers, the United States Attorneys Office promises not to use any statements you give to law enforcement officers and any testimony in front of the Grand Jury against you for use of bringing criminal charges against you either for the arson or for prior perjury to the Grand Jury." Id. However, Donnie was also cautioned that "[y]ou must understand that should the United States Attorneys Office have reasonable grounds to believe that you are further deceptive or giving false or fraudulent answers and/or testimony, this agreement should be null and void and all statements will and can be used against you to prosecute you for these crimes." Id. at 2. Donnie reiterated much of the same information he provided during the polygraph examination in a second appearance before the grand jury on July 17, 1991. This testimony

was also admitted at Earles' and Papajohn's trial when Donnie refused to testify.

Specifically, on July 17, 1991, Donnie testified that he had submitted to the polygraph examination and subsequently had made statements to law enforcement officials that were different from his prior version of what he knew about the fire. The following testimony was then presented:

Q [by Mr. Hobart]. Okay. Could you tell the grand jury what you did not tell them on May 15th of 1991?

A [by Donnie Earles]. What I didn't tell you is I knew my father was planning to burn the grocery store. At that time I didn't know how he was going to do it. They tried to sell the store and couldn't sell it. So his only alternative was to burn it Cathy and him decided. And he tried one night. I took some torches in there for him and helped him take it in. At that time he told me he was going to cut the elevator out, and then later he said he might use the torches. Or I asked him, Do you think you're going to use the torches?

Q. When you say "torches," you're talking about acetyline?

A. Acetyline oxygen cutting torches.

Grand Jury Testimony of Donnie Earles, July 17, 1991, pp. 3–4. Donnie then testified that his father had made one attempt to burn the store, but had decided "[t]he time wasn't right to do it that night." Id. at 4 ll. 15–16. Donnie explained that he had been in and out of the store several times the evening before the fire, but that his father had suggested that he stay away. He testimony continued as follows:

[A.] And then from that point I can't remember—I remember walking—going home, and I remember waving at the sheriff. I can't remember if I walked back to the store and told him that I seen the sheriff out and he drove me to my truck or I walked home. There's a part there I can't remember. I made up so many stories to cover myself that night. I can't remember that part right there. Anyway, I ended up going home. The next morning the store is burnt down. He comes to the house to pick me up. I can't remember if my truck was at the house or I left it at

their house. There's a part there I can't remember. So we go to the shop, and he's telling me that he finally got it done. And he says there's no way they're going to find out how he did it.

He told me in detail how he planned it, how he put boxes under the stairway, he ordered lighter fluid and stick it under the elevator and above to the elevator, and he took a can of lighter fluid and sprayed the whole place down and lit it. He said he could barely get out. It went up that fast. Then he went straight home.

Q. Now, prior to this occasion or after the destruction of the building, did he tell you about how he and Catherine were stockpiling lighter fluid in the building?

A. I don't think I knew that he had ever stockpiled until that next day.

Q. Okay.

A. Because that was his plan. He finally told me what he was doing. He didn't know how he was going to burn it. That night—first night—The day we took the torches in there and acetyline bottles, I think he was down in the basement trying to figure out how to do it. And the next day he finally figured—got in his head he was going to burn it one way or the other. After he burned it I'm sure he told me they were stockpiling for a couple of months to really help the blaze because there's cases and cases down there. He said—He told me where they stockpiled them and—

Q. Has Cathy ever mentioned anything to you about her knowledge of the destruction and who did it?

A. Yes. Because before that they were talking about insurance, that they'd have enough left over to maybe start their truck stop out there on the corner. This is another grocery store that they had out on the corner that's failing. And they talked about how they're going to use the insurance money. And she said she was a nervous wreck that whole night waiting for him to get home because she knew he was getting ready to do it. That morning she was in there when dad was telling me how he did it, how he burned the store.

Grand Jury Testimony of Donnie Earles, July 17, 1991, pp. 5–7. Finally, when asked if he could explain why he hadn't told this version on May 15, 1991, in his first appearance before the grand jury, Donnie responded as follows:

A. Yes, I can. I wanted to. Inside I wanted to. Oh, I didn't want to betray my dad either I guess. But I don't know why. I wanted to tell. I just wanted to get it off. You know, I've been living with this for two years. It's driving me crazy. But with the support of my mother and my fiancé, Linda, it made it real easy for me to come in and tell what happened.

Grand Jury Testimony of Donnie Earles, July 17, 1991, p. 8. This testimony constitutes Donnie's first recantation and is referred to herein as Donnie's "I know everything" grand jury testimony.

When called to testify at the first trial of Papajohn on March 23, 1995, however, Donnie refused to testify, asserting his Fifth Amendment right against self-incrimination. Jury Trial (Partial Transcript), March 23, 1995, testimony of Donnie Earles, p. 27. The court questioned the prosecutor, Mr. Hobart, about Donnie's immunity, and was told that "the government had no intent to charge him with the arson, and that the only thing that he could be prosecuted for would be perjury which is something that I do not have the power to grant him immunity from." *Id.* at 28, *ll.* 20–23.

At the hearing on the pending motions for new trial, Sharon McFall, Donnie's mother, testified to Donnie's anguish upon learning that the Eighth Circuit Court of Appeals had set aside Judge O'Brien's judgment of acquittal and had reinstated the jury verdicts of guilty against Earles and Papajohn. Donnie himself testified that he was coming forward now to "right a wrong." The substance of his latest recantation, elicited from him through tortuous examination and cross-examination at the hearing is that he knows nothing about how the fire started, whether Earles or Papajohn had anything to do with it, and that he really can't remember much about what happened the evening before the fire started. He also testified that he put together his grand jury testimony of July 17, 1991, from hints, suggestions, or coaching by Mr. Hobart and other law enforcement officials. He had testified in accordance with

the government's view of events, so he now says, in the hope of obtaining a reduction of sentence on other charges against him by providing "substantial assistance," and because he was told by Mr. Hobart that he was considered a suspect in the arson and so he felt he needed to protect himself. Donnie also testified that he had tried to "leave the door open" on his first grand jury appearance on the advice of his counsel that he might need something for leverage to gain favorable treatment on other charges.

Donnie also testified extensively, if somewhat incoherently, about coercion and coaching by Mr. Hobart and other law enforcement officials. Furthermore, Donnie stated several times that one fire inspector had repeatedly left the room whenever he was being coached or pressured, because, Donnie believes, he objected to the methods used to obtain Donnie's testimony. A sample of Donnie's testimony at the hearing is the following:

A. Well, in my frame of mind and under the gun and on drugs, incompetent as can beat heck, you can't remember a damn thing hardly, I was a scared kid. I was a scared boy, period. Thought he—thought I was going down for something I don't know nothing about. Got a store burnt down. He's implicated. Now I'm implicated. Don't know a darn thing about it. Mr. Hobart just didn't tell me, you know, that's how it went. But he sure implicated that's how I better save my butt or I'm going to be put behind bars and this and that. I can't tell you that he told me to lie, but I don't think Mr. Hobart was the worst person after me. I think it was that U.S. postal guy when they sent me down for that—oh, I took a lie detector test. But they got me in the middle of that at about the same time when they got me buying—buying dope for a lesser charge on this and it all come at me. I'll tell you, I can't really tell the story straight. It's all coming at me in my mind, pieces here and pieces there. I got pushed—I got pushed—I got pushed towards testifying that way; put it that way. I got pushed from all angles, from the old boy down there—there was a black guy from Chicago, colored boy that give me the—the test, and they said it ain't right and they're all

sitting there drilling me and this and that and my head's going a million mile around. This is what happened, didn't it? How come—what about this gas and what about these bottles, is that how it went, that how it worked? I got fed and I got programmed and I got programmed from everybody in the circuit, not only just Mike Hobart with his—he didn't tell me to lie. He didn't exactly tell me what happened but from his input and this input and that input and that input and I had a hell of a story for that grand jury when I went in there. I got off the hook.

Q. So from various—

A. I bailed myself out.

Q. Is it fair to say then that from various individuals you put together bits and pieces of how the fire theoretically was caused?

A. I had it built in my mind, yeah, eventually.

Q. Did you get any of that information from your father?

A. No. I'll live—I'll live with this till the day I die. I was on dope, drugs, and I wish I could take it back. I wish I was sitting over there. I can't. It's—

Q. Did you get any of that information from Catherine Papajohn?

A. No, no.

Q. Did you get all of the information from the federal authorities?

A. Yes.

Q. One federal authority or another?

A. Well, take it this way. You got this guy going, hey he's against you, okay. Well, hey, we'll make it better. Do this for us and we're going to help you out. Well, hell, I went and bought dope for them, been shot at and everything and never did get no substantial assistance from them. And they put you in this situation. They give me a lie detector test. Well, you ain't telling the truth. This really happened. You didn't really do that. Your dad did that and you did this. You helped him doing this and I end got into the position, oh, yeah, I guess that's how it really worked. Then I thought, well, hell, I'll

bale myself out then and let him fend for himself.

Q. So you determined it was in your best interest to bale yourself out of that situation and point your finger at your father?

A. Yeah. Hell, you could tell me to do about anything back then, and you call these people in. You can ask them.

Draft Transcript of Hearing on Motions for New Trial, October 28, 1997.[6] The entirety of Donnie's testimony at the evidentiary hearing constitutes Donnie's latest recantation, or "re-recantation," because it essentially reaffirms his "I know nothing" testimony from his first grand jury appearance on May 15, 1991. The credibility of this latest recantation and Donnie's explanation for it are considered below in the court's legal analysis.

## II. LEGAL ANALYSIS

■ The court's legal analysis begins with the standards for a new trial pursuant to FED. R.CRIM.P. 33. The court will then turn to analysis of the specific question of whether Earles and Papajohn are entitled to a new trial based on the latest recantation or "re-recantation" of testimony by Earles' son, Donnie.[7]

### A. Standards For A New Trial

The Eighth Circuit Court of Appeals has described the standards for a new trial in a criminal case as "stringent" and "rigorous," because such motions are "disfavored." *See United States v. Grey Bear*, 116 F.3d 349,

350 (8th Cir.1997) (such motions are subjected to "stringent" standards); *United States v. Johnson*, 114 F.3d 808, 817 (8th Cir.1997) (describing the standards for a new trial as " 'rigorous criteria for the grant of this disfavored motion,' " quoting *United States v. Doyle*, 60 F.3d 396, 398 (8th Cir.) (per curiam), *cert. denied*, —— U.S. ——, 116 S.Ct. 538, 133 L.Ed.2d 443 (1995)). The court considers first what are the grounds for such a "disfavored motion" to which such "stringent" or "rigorous" standards are applied.

### 1. Grounds

Rule 33 of the Federal Rules of Criminal Procedure provides for a motion for new trial in a criminal case as follows:

> The court on motion of a defendant may grant a new trial to that defendant *if required in the interest of justice*. If trial was by the court without a jury the court on motion of a defendant for a new trial may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. *A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after the final judgment*, but if an appeal is based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7–day period.

FED.R.CRIM.P. 33 (emphasis added). *See also United States v. Saborit*, 967 F.Supp.

---

**6.** At this time, there is as yet no official transcript of the hearing available, although the court has a draft transcript from which it has verified the content of Sharon McFall's and Donnie's testimony on October 28, 1997.

**7.** Although some question was raised about whether this court has jurisdiction to hear and decide the motions for new trial while a petition for certiorari is pending before the United States Supreme Court, the court concludes that it does have such jurisdiction. *See United States v. Cronic*, 466 U.S. 648, 667 n. 42, 104 S.Ct. 2039, 2051, 80 L.Ed.2d 657 (1984) (when an appeal was pending at the time a motion for new trial was filed, "[t]he District Court had jurisdiction to entertain the motion and either deny the motion on its merits, or certify its intention to grant the motion to the Court of Appeals, which could then entertain a motion to remand the case," citing cases so holding); *United States v. Warner*, 10

F.3d 1236, 1239 (6th Cir.1993) ("Although an appeal was pending at the time Warner moved for a new trial, the district court had jurisdiction over the motion," citing *Cronic* ); *United States v. Coleman*, 688 F.2d 663, 664 (9th Cir.1982) ("[W]here a motion is made under FED.R.CRIM.P. 33 for a new trial on the ground of newly discovered evidence, the motion may be heard during the pendency of an appeal (and may be denied), but the motion may not be granted until the case has been remanded," citing *United States v. Frame*, 454 F.2d 1136, 1138 (9th Cir.), *cert. denied*, 406 U.S. 925, 92 S.Ct. 1794, 32 L.Ed.2d 126 (1972)). If the court determines that the motions should be granted, this court will certify its intention to grant a new trial to the United States Supreme Court, and no new trial may be had until the case is remanded. However, if the court determines that the motions should be denied, nothing bars the court from entering a ruling accordingly.

1136, 1144–45 (N.D.Iowa 1997) (discussing the standards for new trial motions pursuant to FED.R.CRIM.P. 33); *United States v. Schultz,* 917 F.Supp. 1320, 1338–39 (N.D.Iowa 1996) (same). Thus, the rule specifically provides for a motion for a new trial on the ground asserted here, "newly discovered evidence," which in this case consists of the purportedly recent recantation of prior testimony upon which the convictions of Earles and Papajohn were founded.

### 2. "Newly discovered evidence"

■ Although motions for new trial may be based on "newly discovered evidence," the general disfavor with which new trial motions are viewed applies specifically to such motions based on "newly discovered evidence." *See United States v. LaFuente,* 991 F.2d 1406, 1408 (8th Cir.1993) ("We look upon motions for a new trial based on newly discovered evidence with disfavor," citing *United States v. Liebo,* 923 F.2d 1308, 1313 (8th Cir.1991), which in turn quotes *United States v. Gustafson,* 728 F.2d 1078, 1084 (8th Cir.), *cert. denied,* 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984)); *United States v. Richards,* 967 F.2d 1189, 1196 (8th Cir.1992) ("Motions for a new trial based on newly discovered evidence are viewed with disfavor in this circuit," also citing *Gustafson*). Therefore, when a motion for a new trial in a criminal case is based on newly discovered evidence, the defendant must demonstrate the following: (1) the existence of new evidence; (2) that failure to discover the new evidence was not owing to a lack of due diligence; (3) the relevance of the evidence to a material issue; (4) the probability that the evidence would lead to an acquittal on retrial; and (5) that the evidence is not merely cumulative or impeaching. *Johnson,* 114 F.3d at 815; *United States v. Smith,* 62 F.3d 1073, 1078 (8th Cir.1995) ("A defendant seeking a new trial based on newly discovered evidence must show that the evidence is in fact new, that her failure to discover it earlier was not due to lack of diligence, and that the evidence is such that a new trial would likely produce a different outcome. "), *cert. denied,* —— U.S. ——, 116 S.Ct. 826, 133 L.Ed.2d 769 (1996); *United States v. Johnson,* 12 F.3d 827, 833–34 (8th Cir.), *cert. denied,* 511 U.S. 1095, 114 S.Ct. 1860, 128 L.Ed.2d 482 (1994); *LaFuente,* 991 F.2d at

1408 (stating the requirements in essentially the same way as in *Smith* and extracting those elements from *Liebo,* 923 F.2d at 1313); *United States v. Provost,* 969 F.2d 617, 620 (8th Cir.1992) (citing the prior decision in that case, *infra* ), *cert. denied,* 506 U.S. 1056, 113 S.Ct. 986, 122 L.Ed.2d 139 (1993); *United States v. Provost,* 921 F.2d 163, 165 (8th Cir.1990) (per curiam) (stating the elements as in *Johnson,* 114 F.3d at 815, and *Johnson,* 12 F.3d at 833–34), *cert. denied,* 499 U.S. 968, 111 S.Ct. 1603, 113 L.Ed.2d 666 (1991). *See also Richards,* 967 F.2d at 1197 (noting only two of these elements, stating, "To obtain a new trial on the basis of newly discovered evidence, a defendant must show, among other things, that the evidence is in fact newly discovered; *i.e.,* discovered since the trial; and that the newly discovered evidence is of such a nature that, on a new trial, it probably would produce an acquittal.").

In *Grey Bear,* the Eighth Circuit Court of Appeals focused on the requirement that the newly discovered evidence " 'must be of such a nature that, on a new trial, [it] ... would probably produce an acquittal,' " noting that credibility of the new evidence is a prerequisite to this determination. *Grey Bear,* 116 F.3d at 350 (quoting *LaFuente,* 991 F.2d at 1408). The court explained:

> It is the job of the district court, either on affidavits or after an evidentiary hearing ..., to decide whether the newly discovered evidence is credible, *see [United States v.] Coleman,* 460 F.2d [1038,] 1040 [ (8th Cir.1972) (per curiam), *cert. denied,* 409 U.S. 871 [93 S.Ct. 200, 34 L.Ed.2d 122] (1972) ], and, *if so,* whether it would probably produce an acquittal if a new trial were held.

*Grey Bear,* 116 F.3d at 350 (emphasis added). Thus, even if "newly discovered evidence" passes a threshold test of credibility, it must then be tested further to determine whether it is sufficient to convince the court that "it would probably produce an acquittal if a new trial were held." *Id.*

In their reply brief and at the evidentiary hearing on the motions, however, Earles and Papajohn argued for a less grudging standard, citing *United States v. Runge,* 593 F.2d 66 (8th Cir.) (per curiam), *cert. denied,* 444·

U.S. 859, 100 S.Ct. 123, 62 L.Ed.2d 80 (1979). In *Runge,* the Eighth Circuit Court of Appeals wrote,

> Unlike the stricter standard of materiality used in new trial motions based on discovery of new evidence . . ., knowing use of perjured testimony requires that a conviction be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Where the use of known perjury involves prosecutorial misconduct, it constitutes "corruption of the truth-seeking function of the trial process." *United States v. Agurs, supra,* 427 U.S. at 104, 96 S.Ct. at 2397. The government may be responsible even if the prosecutor did not actually know the testimony was perjured, but should have known, *id.* at 103, 96 S.Ct. at 239[7]; *see Giglio v. United States, supra,* 405 U.S. at 154, 92 S.Ct. at 763, 765 or if he or she did not elicit false testimony, but allowed it to go uncorrected when it appeared. *Id.* at 153, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104, *quoting Napue v. [Illinois],* 360 U.S. 264, 269, 79 S.Ct. 1173 [1177–78] 3 L.Ed.2d 1217 (1959). Even false testimony which merely impeaches a witness' credibility may require a new trial. *Giglio v. United States, supra,* 405 U.S. at 154, 92 S.Ct. 763, 766; *Napue v. [Illinois], supra,* 360 U.S. at 269, 79 S.Ct. 1173 [1177].

*Runge,* 593 F.2d at 73. Earles and Papajohn contend that the prosecutor in their criminal trial, Michael Hobart, knew or should have known that Donnie's second grand jury testimony was false, owing to the prosecutor's alleged efforts to coach or coerce such testimony, and the circumstances under which Donnie eventually testified in accordance with the government's view of what happened. The government counters that there is simply no credible evidence of coaching or coercion of Donnie's testimony by Mr. Hobart, and hence no reason he should have known that the testimony given at Donnie's second appearance before the grand jury was not the truth.

Because the government let stand Donnie's testimony concerning coercion and coaching, attempting only to impeach Donnie's credibility without presenting contrary evidence—for example, from Mr. Hobart or other government witnesses Donnie identified as involved in, or apparently objecting to, his coaching and coercion—Earles and Papajohn assert that Donnie's testimony concerning coaching and coercion stands uncontroverted. The defendants are correct that the evidence stands uncontroverted; however, "uncontroverted" does not equate with "credible." Thus, in this case, what Mr. Hobart knew or should have known depends almost entirely on the credibility of Donnie's testimony about coaching and coercion. Consequently, just as the probability that Donnie's recantation would produce an acquittal if a new trial were held depends, under the "stringent" standards stated in *Grey Bear,* upon the threshold requirement that Donnie's recantation be credible, *see Grey Bear,* 116 F.3d at 350, so too, whether the court should apply the more generous standard stated in *Runge*—that a new trial should be granted "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury"—depends primarily upon the credibility of Donnie's testimony about coaching and coercion.

### 3. Discretion

■ Before turning to a more detailed analysis of a new trial motion based on recantation of testimony, it is well to consider the court's discretion to grant or deny a motion for a new trial in a criminal case. In *Grey Bear,* the Eighth Circuit Court of Appeals explained the scope of the district court's discretion in such circumstances:

> [I]n reviewing decisions by the district courts on motions for new trial, our scope of review is narrow. We affirm unless there has been an abuse of discretion. Sometimes, as in *Coleman, supra,* this formulation is strengthened: "A denial by the trial court will not be reversed absent a *clear* abuse of discretion." 460 F.2d at 1040 (emphasis added).

*Grey Bear,* 116 F.3d at 350. *See also Johnson,* 114 F.3d at 815 ("We review the district court's decision for clear abuse of discretion," citing *Johnson,* 12 F.3d at 833–34, which in

turn cites *Provost,* 921 F.2d at 165); *United States v. Gayles,* 1 F.3d 735, 738 (8th Cir. 1993) (also citing *Provost*). Thus, "[t]he grant or denial of a motion for a new trial based on newly discovered evidence is within the trial court's broad discretion," and will be reversed only if the court of appeals "find[s] a clear abuse of discretion." *LaFuente,* 991 F.2d at 1408 (citing *Liebo,* 923 F.2d at 1313); *Provost,* 969 F.2d at 620.

### B. Recantation By A Witness

■ Although the court began with the premise that motions for new trial generally, and motions for new trial based on "newly discovered evidence" in particular, are disfavored in this circuit, the court finds that, when the "newly discovered evidence" upon which the defendant relies is a recantation of testimony used at trial, "stringent" or "rigorous" standards transform into downright skepticism. Thus, this portion of the court's legal analysis examines the nature and reasons for such skepticism, the effect of recantation upon the elements the defendant must prove to win a new trial based on "newly discovered evidence," and finally, the merits of these defendants' new trial motions based on Donnie's latest recantation.

### 1. Skepticism

■ The Eighth Circuit Court of Appeals has suggested on numerous occasions that a motion for new trial based on recantation of testimony should be viewed with skepticism. In *Grey Bear,* the Eighth Circuit Court of Appeals took particular note of the difficulties a defendant faces when his or her motion for a new trial is based on recantation by a witness:

> Motions for new trial, especially when a recantation is involved, are difficult to win. "Motions for new trial based upon the alleged recantation of a material witness should be viewed with disfavor...." *United States v. Coleman,* 460 F.2d 1038, 1040 (8th Cir.1972) (per curiam). It is easy to understand why this should be so. The trial is the main event in the criminal process. The witnesses are there, they are sworn, they are subject to cross-examination, and the jury determines whether to believe them. The stability and finality of verdicts would be greatly disturbed if courts were too ready to entertain testimony from witnesses who have changed their minds, or who claim to have lied at the trial.

*Grey Bear,* 116 F.3d at 350. Furthermore, "new trial motions based on recanted testimony are immediately suspect," *Provost,* 969 F.2d at 620 (citing *United States v. Ward,* 544 F.2d 975, 976 (8th Cir.1976)), because "where a witness makes subsequent statements directly contradicting earlier testimony the witness either is lying now, was lying then, or lied both times." *Id.* (citing *United States v. Bednar,* 776 F.2d 236, 238–39 (8th Cir.1985)).[8] That skepticism is further heightened in cases in which family members are involved and the witness has feelings of guilt or the family members seek to influence the witness to change his or her story. *Id.* at 621.[9] *Accord Russell v. Smith,* 68 F.3d 33, 36 (2d Cir.1995) (finding that a witness's

---

**8.** Indeed, the Eighth Circuit Court of Appeals has suggested more than once that "[a] new trial motion based on recanted testimony can usually be decided without a hearing," on the basis of affidavits, because the judge assessing the credibility and effect of the recantation also heard the witness's trial testimony. *See Gayles,* 1 F.3d at 738; *Provost,* 969 F.2d at 619. However, in this case, the undersigned did not preside at the original trial; thus, he lacks the insight such prior experience with the recanting witness might provide. For this reason, and others, the undersigned has held an evidentiary hearing on the defendants' motions for a new trial. *Cf. LaFuente,* 991 F.2d at 1409 (noting that the district court has "broad discretion" to decide whether to hold an evidentiary hearing on a motion for new trial based on newly discovered evidence); *Provost,* 969 F.2d at 619 (noting that

the need for an evidentiary hearing on recantation of testimony is diminished where the trial judge observed the demeanor and credibility of the recanting witness at trial).

**9.** Although *Provost* involved the credibility of recantation of testimony concerning sexual abuse by a child witness, *see Provost,* 969 F.2d at 621, that distinction does not, to this court's way of thinking, necessarily undercut the applicability of the observation in *Provost* that family loyalties and pressures can have an impact on a recanting witness, even when every family member involved is an adult. The question of the impact of family relationships upon recantation of testimony, this court believes, is one of degree, not one of applicability or inapplicability of the consideration, when the recanting witness is an adult family member.

recantation "is more suspect than most because the testimony he recanted implicated his own brother").

The skepticism expressed by the Eighth Circuit Court of Appeals concerning recantations is shared by other circuit courts of appeals. *See, e.g., Russell v. Smith,* 68 F.3d 33, 36 (2d Cir.1995) ("Courts characteristically treat witness recantations 'with the utmost suspicion,'" quoting *United States v. DiPaolo,* 835 F.2d 46, 49 (2d Cir.1987); *United States v. Badger,* 983 F.2d 1443, 1456 (7th Cir.)) ("Recantations are viewed skeptically."), *cert. denied,* 508 U.S. 928, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993); *May v. Collins,* 955 F.2d 299, 314 (5th Cir.) ("'[R]ecanting affidavits and witnesses are viewed with extreme suspicion by the courts,'" quoting *United States v. Adi,* 759 F.2d 404, 408 (5th Cir.1985)), *cert. denied,* 504 U.S. 901, 112 S.Ct. 1925, 118 L.Ed.2d 533 (1992); *United States v. Chambers,* 944 F.2d 1253, 1264 (6th Cir.1991) ("Recanting affidavits and witnesses are viewed with extreme suspicion."), *cert. denied,* 502 U.S. 1112, 112 S.Ct. 1217, 117 L.Ed.2d 455 (1992). The Fifth Circuit Court of Appeals explained that "[t]he level of insulation the law grants to a skeptical trial judge's assessment of recanting affidavits reflects the notion that trial judges are in the best position to compare a witness's earlier testimony with his new version of the facts." *May,* 955 F.2d at 314–15.

 The defendants contend that most of the reasons stated in *Grey Bear* for viewing recantations with skepticism are inapplicable here. They argue that it is precisely because the "material witness" in question here, Donnie Earles, *did not* testify at the trial and was *not* subject to cross-examination, which left the jury with no real opportunity to determine whether to believe his grand jury testimony or not, that his recantation of the grand jury testimony used at trial should be deemed sufficient grounds for granting them new trials. *Compare Grey Bear,* 116 F.3d at 350 (stating that recantations are to be viewed with disfavor, because "[t]he witnesses are there, they are sworn, they are subject to cross-examination, and the jury determines whether to believe them."). The court also acknowledges that the undersigned did not hear any part of Donnie's trial testimony, which amounted to little more

than a refusal to testify, and has had only transcripts of his grand jury testimony and his limited trial testimony to compare with his live testimony during the evidentiary hearing on the present motions. *Cf. May,* 955 F.2d at 314–15 (a trial judge's skepticism of recanting affidavits "reflects the notion that trial judges are in the best position to compare a witness's earlier testimony with his new version of the facts"). However, the court finds that some degree of skepticism is still appropriate in this case: Although Donnie did not testify *live* at the trial, both versions of his grand jury testimony were presented to the jury, so that the jury did have some basis for testing his credibility, even without cross-examination. *Cf. Grey Bear,* 116 F.3d at 350. Furthermore, because the fact remains that where Donnie is now making statements that directly contradict his earlier testimony, "the witness either is lying now, was lying then, or lied both times." *Provost,* 969 F.2d at 620 (citing *Bednar,* 776 F.2d at 238–39).

#### 2. Credibility, materiality, and impact on retrial

Although, as noted above, a defendant seeking a new trial based on newly discovered evidence must establish five elements to succeed, the Eighth Circuit Court of Appeals has often focused more narrowly on just two or three of those elements when the "new evidence" is actually a recantation of prior testimony. For example, in *United States v. Gayles,* the Eighth Circuit Court of Appeals stated that "[a] motion for a new trial based on recanted testimony should be granted if, among other things, the recantation would probably produce an acquittal on a new trial." *Gayles,* 1 F.3d at 737 (citing *Provost,* 921 F.2d at 164, and *Lewis v. Erickson,* 946 F.2d 1361, 1362 (8th Cir.1991)). *See also Provost,* 969 F.2d at 620 (finding that probability that recantation would produce an acquittal was the "primary issue" on appeal of denial of a new trial motion). The court treated the question of probability that the recantation of testimony would lead to an acquittal as whether the recantation would "cast doubt on the jury's finding" on an element of the offense charged. *Id.* at 738.

■ More recently, in *Grey Bear*, when the Eighth Circuit Court of Appeals considered "new evidence" in the form of a witness's recantation, the court found that the elements of "credibility," "materiality," and "probability that the new evidence would produce an acquittal" were all interrelated:

> The real question [as to credibility], we suppose, is not whether the district judge believed the recantation, but how likely the district judge thought a jury at a second trial would be to believe it. The finding that the witness is not credible, however, at least in the context of this case, appears to us to cover both these bases. Indeed, if a district court does not believe a witness, it seems most unlikely that the same court would find the witness sufficiently persuasive to enable the court to say that the witness's testimony would probably produce an acquittal at a new trial....

> It is true, as appellants stress, that [the recanting witness's] testimony at trial was the only direct evidence of their guilt of [the offense charged]. His recantation, accordingly, is undeniably material and important. Still, if the recantation is not believable, it can hardly be said that it would probably produce a verdict of acquittal at a new trial. It is almost impossible for an appellate court to hold that a district judge's rejection, on credibility grounds, of the testimony of a live witness is clearly erroneous, and we have no disposition to do so here....

*Grey Bear*, 116 F.3d at 350–51. *See also Provost*, 969 F.2d at 620 (probability that a recantation would lead to acquittal "rests in large part on the credibility of the recantation," citing *Bednar*, 776 F.2d at 238–39). To put it another way, "if the court concludes that the recantation is not credible and does not affect the credibility of the original testimony, then it probably would not produce an acquittal on retrial." *Provost*, 969 F.2d at 620. Thus, credibility of the recantation is the key to the impact of the recantation upon the probability that the recantation will lead to an acquittal.

Indeed, some circuit courts of appeals appear to require something more than a finding that the recantation is "credible." In *United States v. Chambers*, 944 F.2d 1253 (6th Cir.1991), after finding that a defendant seeking a new trial based on "newly discovered evidence" must demonstrate essentially the same elements required in this circuit,[10] the Sixth Circuit Court of Appeals found that, in the case of a recantation, the "first test to be applied by the judge is *whether the court is reasonably well satisfied that the prior testimony was false.*'" *Chambers*, 944 F.2d at 1264 (quoting *United States v. Kearney*, 682 F.2d 214, 220 (D.C.Cir.1982), in turn citing *Gordon v. United States*, 178 F.2d 896, 900 (6th Cir.1949), *cert. denied*, 339 U.S. 935, 70 S.Ct. 664, 94 L.Ed. 1353 (1950); emphasis added by this court). Furthermore, the court observed, " '[i]f that first and primary ground is not satisfied, the primary ground for granting the new trial is lacking.' " *Id.* (again quoting *Kearney* ). Similarly, in *United States v. Badger*, 983 F.2d 1443, 1456 (7th Cir.), *cert. denied*, 508 U.S. 928, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993), the Seventh Circuit Court of Appeals held that a new trial based on recantation of trial testimony "is necessary when 1) *the court is satisfied that the testimony given by a material witness is false;* 2) without the false testimony the jury might have reached a different conclusion; and 3) the party seeking the new trial was taken by surprise when the false testimony was given and could not address that falsity until after trial." *Id.* (emphasis added).[11]

■ This court believes that a finding that the *trial* testimony was *false* is not precisely

---

10. In *Chambers*, the Sixth Circuit Court of Appeals stated the required elements as follows: "the evidence (1) was discovered only after trial, (2) could not have been discovered earlier with due diligence, (3) is material and not merely cumulative or impeaching, and (4) would likely produce an acquittal if the case were retried." *Chambers*, 944 F.2d at 1264. Thus, this formulation of the elements the defendant must prove to obtain a new trial based on "newly discovered evidence" merely combines the separate "materi-

ality" and "not cumulative or impeaching" elements required by the Eighth Circuit Court of Appeals. *See Johnson*, 114 F.3d at 815.

11. In *Badger*, the Seventh Circuit Court of Appeals acknowledged that there was some dispute as to how much "surprise" is required, but found that the motion then before the court could be resolved on the first element. *Badger*, 983 F.2d at 1456–57.

equivalent to a finding that a recantation is *credible,* which is one of the requirements for a new trial based on recantation in this circuit. *See Grey Bear,* 116 F.3d at 350 ("It is the job of the district court, either on affidavits or after an evidentiary hearing ..., to decide whether the newly discovered evidence is credible."). Although a finding that a recantation is credible raises an *inference,* even a strong inference, that the trial testimony was *false,* it does not compel that conclusion. In this circuit, the impact of the conclusion that the recantation is "credible" is weighed further against a relatively high mark-the court must determine whether a credible recantation would "probably" produce an acquittal on retrial. *See Grey Bear,* 116 F.3d at 350. In the Seventh Circuit, on the other hand, where the initial determination is more stringent, once the court is satisfied that the trial testimony was *false,* the effect of that false testimony must only satisfy a relatively low threshold to require a new trial-the court need only find further that, without the false testimony, the jury "might have," not probably would have, reached a different conclusion. *See Badger,* 983 F.2d at 1456.

Furthermore, as observed above, in the circumstances of this case, the credibility of the recanting witness's testimony at the evidentiary hearing concerning the circumstances in which false testimony was originally extracted from him will also determine whether the applicable standard is that the defendants must show a "probability" that the recantation would produce an acquittal on retrial, *see Grey Bear,* 116 F.3d at 350, or merely a "reasonable likelihood that the [now purportedly] false testimony could have affected the judgment of the jury." *See Runge,* 593 F.2d at 73. Much depends upon the credibility of Donnie's testimony at the evidentiary hearing.

### 3. *Donnie Earles' recantation*

#### a. *"Newly discovered evidence"*

▪ Before considering the substantive questions of the credibility and impact of Donnie's recantation, however, the court must consider the procedural prerequisite to relief on the defendants' motions for new trial: Is the evidence upon which Earles and Papajohn rely really "newly discovered evidence"? FED.R.CRIM.P. 33; *Johnson,* 114 F.3d at 815; *Smith,* 62 F.3d at 1078; *Johnson,* 12 F.3d at 833–34; *LaFuente,* 991 F.2d at 1408; *Provost,* 969 F.2d at 620; *Richards,* 967 F.2d at 1197; *Provost,* 921 F.2d at 165.

The government relies upon cases in which the Eighth Circuit Court of Appeals has cast considerable doubt on whether new testimony by a witness who made himself or herself unavailable for trial can be considered "newly discovered evidence":

> The "newly discovered evidence" to which [the defendant] refers is a letter to the district court from [a] co-defendant [ ] exculpating [the defendant]. [The co-defendant], however, maintained his silence during the trial and submitted this letter only as a post-trial statement. In *United States v. Offutt,* 736 F.2d 1199, 1202 (8th Cir.1984), we observed that "when a defendant who has chosen not to testify subsequently comes forward to offer testimony exculpating a codefendant, the evidence is not 'newly discovered.'" Accordingly, the district court did not abuse its discretion in denying [the defendant's] motion for a new trial.

*United States v. Rogers,* 982 F.2d 1241, 1245 (8th Cir.), *cert. denied sub nom. Philipp v. United States,* 509 U.S. 912, 113 S.Ct. 3017, 125 L.Ed.2d 706 (1993). Similarly, the Seventh Circuit Court of Appeals has distinguished between a "newly available" witness and "newly discovered evidence" in a case in which a witness asserted his privilege against self-incrimination at trial rather than testify that he, not the defendant, had secreted cocaine later found by the police in the residence where the defendant was arrested. *See United States v. Glover,* 21 F.3d 133, 138 (6th Cir.), *cert. denied,* 513 U.S. 948, 115 S.Ct. 360, 130 L.Ed.2d 314 (1994). In *Glover,* the court wrote,

> Here, [the defendant] is unable to establish that the evidence offered by [the witness] "was discovered after the trial" and thus he fails to carry his burden of proof. [The defendant] acknowledges that he was well aware of [the witness's] testimony prior to trial. As [the defendant's] counsel conceded at the sentencing hearing:

I knew that he ([the witness]) existed, the fact of the matter is that we subpoenaed him back in June the 29th of '92 to appear in court.... [H]e had a trial going on or had been convicted. And Mrs. Ferguson was his attorney. I spoke with her about him, [and she said] I'm not going to let you put him on, if you put him on, you know, he is going to plead the Fifth.

April 1, 1993 Hearing Transcript at 8–9. While [the witness's] testimony may have been newly available, it was not in fact "newly discovered evidence" within the meaning of Rule 33. In so holding, this Court is in accord with other circuits that have addressed this issue. *See, e.g.; United States v. Lockett,* 919 F.2d 585, 591 (9th Cir.1990) ("[W]hen a defendant who has chosen not to testify comes forward to offer testimony exculpating a codefendant, the evidence is not 'newly discovered.' "); *United States v. DiBernardo,* 880 F.2d 1216, 1224–25 (11th Cir.1989) (where defendants were "well aware" of witness' proposed testimony prior to trial, "the testimony cannot be deemed 'newly discovered evidence' within the meaning of Rule 33"); *United States v. Jacobs,* 475 F.2d 270, 286 n. 33 (2d Cir.) ("a court must exercise great caution in considering evidence to be 'newly discovered' when it existed all along and was unavailable only because a codefendant, since convicted, had availed himself of his privilege not to testify"), *cert. denied,* 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973).

*Glover,* 21 F.3d at 138.

Earles and Papajohn make a valiant, but unavailing attempt to distinguish this line of cases. They contend that (1) Donnie was not charged with the alleged arson, and the language of the Eighth Circuit Court of Appeals in *Rogers* and *Offutt* addresses new testimony from co-defendants only; (2) Donnie did in fact testify, albeit they assert falsely, via his grand jury testimony, whereas in *Rogers* and *Offutt,* the evidence offered in favor of the motions was from co-defendants who did not testify in any form, live or otherwise, at trial; and (3) Donnie did not "choose" not to testify at trial, but was instead "boxed into a corner" where he was trapped into testifying falsely or facing a potential perjury charge.

As to their first distinction, the court is not persuaded that the rule stated in *Rogers* and *Offutt* can be read to apply exclusively to "co-defendants" who refuse to testify at trial. As this court reads *Rogers* and *Offutt,* it was not a co-defendant relationship between the defendant and the witness that caused the court to hold that the evidence was not "newly discovered," but the fact that the witness now providing exculpatory evidence was unavailable at trial only because he or she refused to testify. *See Rogers,* 982 F.2d at 1245 (the co-defendant, who later provided exculpatory evidence, "maintained his silence during the trial and submitted this letter only as a post-trial statement"); *Offutt,* 736 F.2d at 1202 (the co-defendant had chosen not to testify at trial, but subsequently came forward with exculpatory testimony). Plainly, other circuit courts of appeals do not require a co-defendant relationship, instead focusing on whether the defendant knew of the testimony, despite the witness's refusal to testify at trial. *See Glover,* 21 F.3d at 138 (the witness who later provided exculpatory evidence had not been a defendant at the original trial, although he had been known to the defendant and refused to testify); *DiBernardo,* 880 F.2d at 1224–25 (where the defendants were "well aware" prior to trial of the testimony of a witness later offered as presenting new exculpatory evidence, the testimony could not be deemed "newly discovered evidence").

Here, Donnie's latest version of his testimony was unavailable at trial only because he refused to testify. *Cf. Rogers,* 982 F.2d at 1245; *Offutt,* 736 F.2d at 1202. *Accord Glover,* 21 F.3d at 138 (the witness, who was not a co-defendant, was unavailable only because he asserted his right against self-incrimination, and therefore was not "newly discovered"). Furthermore, the defendants were well aware that Donnie could be the source of his present testimony well in advance of trial, *because this is the version to which he testified on his first appearance before the grand jury. Cf. Glover,* 21 F.3d at –138 (the exculpatory testimony was not "newly discovered" where the witness and his potential testimony had been known to the defendant, but the witness refused to testify at trial); *DiBernardo,* 880 F.2d at 1224–25 (exculpato-

ry testimony was not "newly discovered evidence" where the defendants were "well aware" of the testimony prior to trial).

Earles' and Papajohn's second assertion is also a distinction without a difference. The defendants are correct that Donnie did testify at trial via his grand jury testimony, whereas in *Rogers* and *Offutt,* the evidence offered in support of the motions was from co-defendants who did not testify at trial in any way. However, whether the witness had first provided *incriminating* evidence before proffering *exculpatory* evidence, the situation here, is in reality no different from the situation in which a witness (or co-defendant) allows incriminating evidence, albeit from some other source, to be presented while withholding exculpatory evidence. *Cf. Rogers,* 982 F.2d at 1245 (the witness proffering exculpatory evidence post-trial sat silent during the trial in which the defendant was convicted); *Offutt,* 736 F.2d at 1202 (same). At the time of trial, Donnie could have presented his exculpatory (or simply non-incriminating) testimony to contradict other incriminating evidence, including his own "I know everything" grand jury testimony, just as surely as could the silent witnesses in *Rogers, Offutt,* and *Glover.*

Third, as to the defendants' assertion that Donnie did not "choose" to withhold his exculpatory testimony, but was instead boxed into a situation where his only option was to refuse to testify or to face a perjury charge for reversing his testimony, the court sees no distinction between a co-defendant's "choice" not to testify for fear of incriminating himself or herself on the charge laid against the defendant, *see Rogers,* 982 F.2d at 1245; *Offutt,* 736 F.2d at 1202, and the "choice" of a witness who refuses to testify for fear of incriminating himself or herself on a perjury charge. Admittedly, in each of these cases, the "choice" presented to the witness to testify or not to testify is a hard one; but the witness nonetheless chooses not to provide evidence that existed all along and that was unavailable only because the witness—whose

existence, and in this case even his exculpatory testimony, were not unknown to the parties—asserted a right against self-incrimination.

Because Donnie refused at the time of trial to provide the testimony he now proffers, even though he was a witness known to the defendants and he was given the opportunity to present this testimony, under *Rogers* and *Offutt,* his recantation of his grand jury testimony is not "newly discovered evidence" within the meaning of Rule 33.

■ Furthermore, even without *Rogers* and *Offutt* to rely upon, the court would conclude that Donnie's latest recantation is not "newly discovered evidence" within the meaning of Rule 33. Again, the testimony Donnie now offers—that he knows nothing whatever about how the fire at the IGA started or about Earles or Papajohn's involvement in any fire—is essentially the same as the testimony he gave at his first grand jury appearance. Furthermore, that "I know nothing" testimony was actually presented in the trial, because *both* the May 15, 1991, and July 17, 1991, versions of Donnie's grand jury testimony were admitted. The fact that what is at issue here is a re-recantation thus is an unusual, distinct, and insurmountable impediment to the defendants' new trial motions.

■ In short, the jury has heard this evidence before; that being so, the latest recantation cannot be considered "newly discovered evidence" upon which to base a new trial. *See* FED.R.CRIM.P. 33 (permitting a new trial on the basis of "newly discovered evidence"). *See also Johnson,* 114 F.3d at 815 (requiring that the evidence in fact be "newly discovered"); *Smith,* 62 F.3d at 1078 (same); *Johnson,* 12 F.3d at 833–34 (same); *LaFuente,* 991 F.2d at 1408 (same); *Provost,* 969 F.2d at 620 (same); *Richards,* 967 F.2d at 1197 (same); *Provost,* 921 F.2d at 165 (same).[12] Hence, the defendants' motions will be denied for failure to satisfy the re-

---

**12.** To address another prong of the five-element inquiry applicable to motions for new trial based on "newly discovered evidence," the court concludes that the latest recantation is also essentially cumulative or impeaching testimony, because it simply reaffirms one of the contradictory versions of Donnie's testimony already presented to the jury. *See Johnson,* 114 F.3d at 815 (a motion for new trial cannot be based on evidence that is merely cumulative or impeaching; *Johnson,* 12 F.3d at 833–34 (same); *Provost,* 969 F.2d at 620 (same); *Provost,* 921 F.2d at 165 (same)).

quirement that the evidence upon which they rely be "newly discovered."

### b. Credibility, materiality, and impact on retrial

■ In the alternative, assuming for the sake of argument that Donnie's re-recantation can be considered "newly discovered evidence," the court will turn to a substantive analysis of that evidence. *See Richards,* 967 F.2d at 1197 (the court assumed that the recantation of pre-trial statements by a defendant who absconded prior to trial and who reappeared with the recantation only after trial constituted "newly discovered evidence" and instead considered the impact of the recantation upon a retrial); *accord Badger,* 983 F.2d at 1456 ("An affidavit recanting trial testimony is newly discovered evidence, and, if the circumstances are appropriate, may warrant a new trial."). That analysis, as the court has observed, must focus at least initially on Donnie's credibility.

■ *i. Credibility.* As always, the district court's determination of credibility is most persuasive when it is accompanied by a statement of reasons for the determination. For example, in *Grey Bear,* the court noted,

[I]n the present case, the District Court did not simply announce its disbelief of [the recanting witness] in a conclusory fashion. It referred back to its earlier opinion in the *LaFuente* case, in which it had given specific reasons for disbelieving [that witness], reasons which appear to us to make sense.

*Grey Bear,* 116 F.3d at 350. Several factors are pertinent to the court's assessment of the credibility of a witness: (1) the interest of the witness in the result of the hearing; (2) the witness's relation to any party in interest; (3) the witness's demeanor upon the witness stand; (4) the witness's manner of testifying; (5) the witness's tendency to speak truthfully or falsely, including the probability or improbability of the testimony given his or her situation to see and observe; (6) the witness's apparent capacity and willingness to tell truthfully and accurately what he or she saw and observed; and (7) whether the witness's testimony is supported or contradicted by other evidence in the case. *See United States v. Phillips,* 522 F.2d 388, 391 (8th Cir.1975). *Accord United States v. Mer-*

*rival,* 600 F.2d 717, 719 (8th Cir.1979); *Clark v. United States,* 391 F.2d 57, 60 (8th Cir.), *cert. denied,* 393 U.S. 873, 89 S.Ct. 165, 21 L.Ed.2d 143 (1968); EIGHTH CIRCUIT MANUAL OF MODEL JURY INSTRUCTIONS: CRIMINAL, Instruction 3.04 (1996).

Other circuit courts of appeals have identified a number of factors that are relevant to the specific question of whether a recantation is credible. For example, the Second Circuit Court of Appeals recently considered the following factors: (1) whether the *recanted* testimony implicated a family member; (2) whether the *recanted* testimony was consistent with other statements the witness had given; (3) whether the *recanted* testimony was substantially corroborated by other evidence; and (4) whether the witness was willing to assert the *recantation* in open court. *Russell,* 68 F.3d at 36. Where the recanted testimony—the testimony actually presented at trial—appeared credible, and the post-trial recantation of that trial testimony did not appear credible, according to these factors, and the witness refused to assert the recantation in open court, the court concluded that the defendant had failed to show that the recantation was credible. *Id.* Similarly, the Sixth Circuit Court of Appeals affirmed the district court's conclusion that the witness's recantation was not credible in light of the fact that the witness was now contradicting some trial testimony and asserting that he had "exaggerated" other trial testimony, his recantation was contradicted by the trial testimony of numerous other witnesses, and the witness had a motive to fabricate his recantation. *Chambers,* 944 F.2d at 1263–64.

In this case, the court not only concludes that it does not find Donnie to be a credible witness, but the court concludes that it is highly unlikely that a jury at a second trial would believe his latest recantation of testimony. *See Grey Bear,* 116 F.3d at 350 (considering that the question of credibility is "not whether the district judge believed the recantation, but how likely the district judge thought a jury at a second trial would be to believe it"). The court begins with the first two of the *Phillips–Merrival* factors, Donnie's interest in the result of the hearing and his relation to any party in interest. *See Merrival,* 600 F.2d at 719; *Phillips,* 522 F.2d

at 391; *Clark*, 391 F.2d at 60; EIGHTH CIR-CUIT MANUAL OF MODEL JURY INSTRUCTIONS: CRIMINAL, Instruction 3.04 (1996). These factors have particular significance in the case of a recantation. *See Provost*, 969 F.2d at 621 (skepticism of recantations is appropriate where family members are involved and the witness has feelings of guilt or the family members seek to influence the witness to change his or her story). *Accord Russell*, 68 F.3d at 36 (finding that a witness's recantation "is more suspect than most because the testimony he recanted implicated his own brother"). Here, Donnie is plainly interested in the acquittal of a family member, his father, as well as his father's companion, and his recanted testimony implicated both of them. In his grand jury appearance on April 5, 1994, in which he stated his refusal to provide any further testimony concerning the fire at the IGA either to the grand jury or at a trial of Earles or Papajohn, Donnie repeatedly asserted that he was not going to testify against his father. Government Exhibit 3, Transcript of Grand Jury Testimony of Donnie Earles, April 5, 1994. Donnie again stated that the basis for his refusal to testify at the first trial of defendant Papajohn on March 23, 1995, was that he was not going to testify against his father and was not going to testify against Papajohn either, because "she's family also." Government Exhibit 5, Partial Transcript of Jury Trial Testimony of Donnie Earles, March 23, 1995, p. 31, *l.* 9, to p. 32 *l.* 3. At the evidentiary hearing, Donnie eventually responded to the question, "So you didn't want to hurt your father?" as follows:

> A [by Donnie Earles]. Well, why would anybody tell a grand jury if he wasn't—who would go against their father? Who would say something like that if he wasn't in a frame of mind that's what could out, doped up? I mean, would you go against your father and say something like that in a grand jury like I did? It's not right. I'd do anything to bale myself out. That's what I done.

Draft Transcript of Hearing on Motions for New Trial, October 28, 1997. Slightly later, the following exchange also occurred:

> Q [by Mr. Meade]. Well, you want to help your father, don't you?

> A [by Donnie Earles]. Who doesn't? Yeah.

*Id.*

Furthermore, Donnie's last two stances on his testimony—his refusal to testify at trial and his latest recantation of his grand jury testimony—appear to have been timed and calculated to help his father. His refusal to testify was robbed of its effectiveness by the admission of his grand jury testimony, and his grand jury testimony was not recanted until the Eighth Circuit Court of Appeals held that it was properly admitted at trial. In other words, Donnie had obvious reasons to fabricate his latest recantation at the time it was finally offered. *Chambers*, 944 F.2d at 1263–64 (considering a witness's motives to fabricate a recantation).

Furthermore, Donnie's recanted testimony—his "I know everything" grand jury testimony—is supported by other evidence in the case, while his latest recantation—his reaffirmation of his first grand jury "I know nothing" testimony—is cast in considerable doubt not only by his various versions of events, but by corroborating evidence concerning his presence in downtown Sloan on the evening before the fire and circumstantial evidence of how the fire started, Papajohn's financial difficulties with the store, and evidence of large amounts of lighter fluid in the store. *See Merrival*, 600 F.2d at 719 (considering whether a witness's testimony is corroborated or contradicted by other evidence); *Phillips*, 522 F.2d at 391 (same); *Clark*, 391 F.2d at 60 (same); EIGHTH CIR-CUIT MANUAL OF MODEL JURY INSTRUCTIONS: CRIMINAL, Instruction 3.04 (1996) (same). *Accord Russell*, 68 F.3d at 36 (considering whether the recanted testimony or the recantation was corroborated by other trial evidence); *Chambers*, 944 F.2d at 1263–64 (considering whether the recanted testimony or the recantation was supported by other evidence at trial). In its brief, the government has effectively marshaled the evidence at trial that supports Donnie's July 17, 1991, "I know everything" version of events. Donnie's latest recantation—his reaffirmation of his "I know nothing" testimony at his first grand jury appearance—and the reasons for

his latest recantation, in contrast, rest almost entirely upon his own testimony.

The defendants have attempted to support the credibility of Donnie's latest recantation with circumstantial evidence—such as their assertion that Mr. Hobart's statement that he could not extend Donnie's immunity at the time of trial to perjury is misleading, when Mr. Hobart had granted Donnie immunity from perjury to obtain his second grand jury testimony, thus "locking in" Donnie's false testimony, and their assertion that Donnie's language in the polygraph transcript indicates that he is parroting things he has been told by officials, not stating matters from firsthand knowledge. However, the fact that Donnie stated that "it seems like" certain things are true in the polygraph examination could be based on his understanding of information from his *father* just as easily as it could be based on his understanding of information from *authorities*.

Although the court has little doubt that Mr. Hobart or other authorities "coached" Donnie's second grand jury testimony, the court does not believe that "coaching" reached an impermissible level. Rather, having watched Donnie testify, the court believes that it would be very difficult for a prosecutor to have any clear idea of precisely what Donnie's testimony would be if Donnie wasn't asked to verify a statement rather than asked to narrate events. At bottom, the court is simply not persuaded that the inferences the incidents identified by the defendants may raise in the defendants' favor can overcome Donnie's complete lack of credibility based on other factors.

The credibility of Donnie's latest recantation is also undercut by his manner of testifying and the improbability of what appears to be his ultimate version of what he knew about the fire. *Cf. Merrival,* 600 F.2d at 719 (considering the witness's demeanor upon the witness stand, his manner of testifying, and the probability or improbability of the testimony given); *Phillips,* 522 F.2d at 391 (same); *Clark,* 391 F.2d at 60 (same); EIGHTH CIRCUIT MANUAL OF MODEL JURY INSTRUCTIONS: CRIMINAL, Instruction 3.04 (1996) (same). His testimony is full of uncertainties and constant amendments to statements just made, rendering it at best nebulous, at worst almost incoherent. At the

evidentiary hearing, in the course of relatively brief testimony, literally dozens of times Donnie stated he could not recall facts, or wasn't sure when or what happened, what was said, or what he himself did or knew. Indeed, most illuminating, and the one part of Donnie's testimony the court readily finds credible, is Donnie's statement at the evidentiary hearing that "I'll tell you, I can't really tell the story straight."

■ Nor is the court persuaded that Donnie's latest recantation in the face of fears of a perjury prosecution is strongly supportive of the credibility of this re-recantation, as defendants maintain, because every recantation brings with it the possibility of a perjury prosecution. If the possibility of perjury penalties were enough to make every recantation credible, there would be virtually no situation in which a new trial would not be required if the recantation involved material testimony. As the Eighth Circuit Court of Appeals observed in *Grey Bear,* if recantations were accepted without skepticism, "[t]he stability and finality of verdicts would be greatly disturbed," and a trial, which should be "the main event in the criminal process," would become little more than a first step in a never ending series of hearings and rehearings. *Grey Bear,* 116 F.3d at 350.

Not only do these factors make it impossible for the undersigned to find Donnie credible, these and additional factors convince the court that no reasonable jury at a second trial would believe his testimony either. *See Grey Bear,* 116 F.3d at 350 (identifying the "real question" as "how likely the district judge thought a jury at a second trial would be to believe [the recantation]," not whether the district judge believed the recantation). The jury at the first trial was confronted with two versions of Donnie's testimony, the May 15, 1991, "I know nothing" version, and the July 17, 1991, "I know everything" version, because transcripts of both grand jury appearances were admitted at the trial. Now, in addition to the first "I know nothing" version and the second "I know everything" version, there is an "I'm not saying what I know" version, encompassed in Donnie's refusal to testify, and, finally, a reiteration of his "I know nothing" version.

Donnie's credibility with any reasonable jury can only be diminished by this series of recantations or assertions of incompatible versions.

Donnie's latest recantation simply is not credible. Because the court finds that Donnie's re-recantation fails the threshold requirement of credibility, the court need never reach the next part of the inquiry, which is whether, if credible, the evidence would probably produce an acquittal if a new trial were held, *see Grey Bear,* 116 F.3d at 350 ("It is the job of the district court ... to decide whether the newly discovered evidence is credible ..., and *if so,* whether it would probably produce an acquittal if a new trial were held"; emphasis added, citations omitted), and the defendants' motions for new trial must be denied.

■■■■ *ii. Materiality and impact on retrial.* Although the court recognizes that, under *Grey Bear,* it need never reach the question of the impact of the latest recantation upon a retrial if it simply does not find that re-recantation credible, the court will nonetheless take the next step and consider that question. Even assuming the court could either find Donnie credible or could find that a reasonable jury would likely believe the re-recantation, *see Grey Bear,* 116 F.3d at 350, the court could not find that a new trial was required.[13]

That conclusion, however, is not based upon any lack of materiality of Donnie's re-recantation. The government marshaled other evidence presented at trial in an attempt to demonstrate that Donnie's grand jury testimony implicating the defendants is not material to the case or that the loss of it would not necessarily make an acquittal probable. The defendants take issue with that stance, because the government had asserted at trial that Donnie's testimony was

essential to the prosecution's case in order to get the grand jury testimony in when Donnie refused to testify. The court cannot help but find that Donnie's testimony is extremely material to the issues in the trial. *Cf. Grey Bear,* 116 F.3d at 351 (where a witness's testimony was the only direct evidence of the defendants' guilt, his recantation "accordingly, is undeniably material and important").

But even so, as in *Grey Bear,* "if the recantation is not believable, it can hardly be said that it would probably produce a verdict of acquittal at a new trial." *Id.* First, the skepticism with which recantations are viewed generally extends to skepticism of the extent to which a recantation would probably produce an acquittal, at least when the recanting witness has intentionally made himself or herself unavailable for trial. *See Richards,* 967 F.2d at 1197. In *Richards,* the recanting witness had given information inculpating the defendant prior to trial, but then was a fugitive from justice at the time of trial. *Id.* She "resurfaced" only after the trial, with a version of her story about the crime in question that was "entirely different" from the version she had previously given the government. *Id.* Assuming that such evidence would qualify as "newly discovered evidence," the Eighth Circuit Court of Appeals wrote, "[W]e cannot say that the District Court abused its discretion in finding that, given [the witness's] prior inconsistent statements and the fact that she made herself unavailable as a trial witness by jumping bail and dropping out of sight, 'her testimony would probably not produce an acquittal of defendant.'" *Id.* (quoting the district court). Thus, Donnie's refusal to testify at trial, followed by a re-recantation only when his refusal to testify failed to produce an acquittal, probably would not produce an acquittal of these defendants.

---

13. The court's conclusion that Donnie is not a credible witness extends to the credibility of Donnie's testimony concerning the reasons for his re-recantation—that the testimony given at his second grand jury appearance, which implicated Earles and Papajohn, had been improperly coached or coerced from him by the prosecutor. As noted above, in *Runge,* the Eighth Circuit Court of Appeals held that a defendant need only demonstrate a "reasonable likelihood that the [now purportedly] false testimony could have affected the judgment of the jury," where the pros-

ecutor knew or should have known the trial testimony was false, *see Runge,* 593 F.2d at 73, not a "probability" that the new evidence would result in an acquittal. *See Grey Bear,* 116 F.3d at 350. Because Donnie simply is not credible, the court finds no basis for applying the lenient standard of review of the impact of a recantation asserted by the defendants, because there is no credible basis for concluding that the prosecutor knew or should have known Donnie's second statement to the grand jury was false.

Similarly, in *Bednar,* the court held that "newly discovered evidence" consisting of an affidavit of a grand jury witness who did not testify at trial was not likely to produce an acquittal when the affidavit substantially contradicted the witness's grand jury testimony. *Bednar,* 776 F.2d at 238–39. Here, Donnie's contradiction of his second grand jury testimony is equally unlikely to produce an acquittal.

Finally, the court finds this situation is distinct from one in which a jury hears a recantation for the first time. In this case, the jury heard both Donnie's "I know nothing" and "I know everything" versions at trial, because both his May 15, 1991, and July 17, 1991, grand jury testimony were admitted. Thus, the jury at trial has already weighed the version of Donnie's testimony embodied in his latest recantation against the incriminating version of his testimony. In such a situation, the *possibility* that this latest recantation would result in an acquittal on retrial is considerably diminished, and the *probability* that it would do so is almost nonexistent. On this further, alternative ground, the defendants' motions for new trial must be denied.

### III. CONCLUSION

Skepticism has ripened into disbelief of Donnie's re-recantation of testimony, in part because, as Donnie himself said, he "can't really tell the story straight." Having found that Donnie's re-recantation is not in fact "newly discovered evidence" as required for a new trial under FED.R.CRIM.P. 33, or in the alternative, that the "newly discovered evidence" is neither credible to the court, nor likely to be credible to a jury, nor likely to produce an acquittal on a retrial, the court concludes that the defendants' motions for new trial must be, and are, hereby **denied.**

**IT IS SO ORDERED.**